UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEVIN KELLY and MARK WILKINS,

                Plaintiffs,

        v.

DCC TECHNOLOGY HOLDINGS, INC. and
EXERTIS (UK) LIMITED,

                Defendants.
_____

**COMPLAINT**

Case No. _____

      Plaintiffs Kevin Kelly and Mark Wilkins, by their attorneys, Phillips Lytle LLP, for its complaint against Defendants DCC Technology Holdings, Inc. ("DCC") and Exertis (UK) Limited ("Exertis UK"), alleges:

**INTRODUCTION**

      1.    This case concerns broken promises made by DCC in its acquisition of a company Plaintiffs Kevin Kelly and Mark Wilkins built.  Plaintiffs agreed to sell to DCC their shares in Stampede Global Holdings, Inc., in exchange for a base purchase price and post-closing earn-out payments.  Earn-out payments were to be determined by a carefully structured formula for the calculation of profit based on revenues derived from a specifically defined line of business after the sale closed.  DCC, however, ignored the parties' agreements by systematically excluding funds from the mandated formula, and breached express covenants in the parties' written agreements through a multi-pronged scheme that was intended to minimize earn-out payments.  Although both revenues and profits from the subject line of business were far higher than anticipated at the time of the acquisition, DCC

asserts that the earn-out payments should be much lower than the parties estimated based on the mandated formula and well below the original valuation.  This assertion is contrary to the parties' agreements and common sense.  Plaintiffs bring this action to hold DCC to its word and recover the proper earn-out payments due.

## THE PARTIES

2.     Plaintiff Kevin Kelly is an individual and a resident of the State of New York.

3.     Plaintiff Mark Wilkins is an individual and a resident of the State of Florida.

4.     Defendant DCC is a corporation organized under the laws of Delaware, with its principal place of business in Ireland.

5.     Defendant Exertis UK is a company organized under the laws of England and Wales, with its principal place of business in England.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this controversy based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

7.     The amount in controversy exceeds the sum specified by 28 U.S.C. § 1332, exclusive of interest and costs.

8.     Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.     As described below, Defendants have contractually agreed to submit to the jurisdiction of the Federal courts of the United States of America.

## BACKGROUND

**A.    Plaintiffs Spend Decades Growing the Stampede Business Before Being Pursued by DCC**

10.    In 2018, Plaintiffs were the sole shareholders of Stampede Global Holdings, Inc. ("SGH"), the global leader in high value-added Professional Audio Visual ("Pro AV") distribution, which includes audio equipment, audio receivers, cables and connectivity, classroom audio, digital signage, lamps, projectors, microphones, and presentation accessories.

11.    SGH owned, directly and indirectly, all of the outstanding equity of Stampede Presentation Products Inc. ("SPP"); Stampede Presentation Products (Canada) Inc.; Stampede Global Europe Ltd.; Diamond Lamps Pte Ltd.; Stampede Global UK Ltd.; Just Lamps Nordic AB; Just Lamps Pte Ltd.; Just Lamps Malaysia Sdn Bhd; and Just Lamps Australia Pty Ltd. (collectively, "Stampede").

12.    Wilkins co-founded SPP in 1997, in Buffalo, New York, and served as the company's President and CEO.

13.    Kelly joined SPP in 2001 as its Vice President of Sales and Marketing, then served as its President and COO from 2004 until the acquisition in 2018.  Upon the retirement of Wilkins as CEO, Kelly served as President and CEO of SGH.

14.    SPP originally engaged in wholesale distribution of video projectors. Plaintiffs expanded Stampede over the course of two decades into an industry leader of value-added distribution of Pro AV and consumer electronics with more than 220 employees worldwide, covering the United States, Canada, Latin America, Europe, Asia, and Australia, including 80 employees at its Buffalo, New York headquarters.

15.     Stampede now provides global distribution services for consumer, business, and enterprise technology products from pioneering and industry leading technology brands.

16.     In October 2017, Kelly received a LinkedIn message from Niall Ennis, Managing Director of DCC's Technology Group and an employee of the parent company, DCC Plc.

17.     DCC Plc is an Irish holding company that is publicly traded on the London Stock Exchange and it is a constituent of the FTSE 100 Index.  Its revenues exceed $16 billion and it employs 13,700 people in 20 countries.  DCC Plc focuses on mergers and acquisitions of cash-generating business with high returns on capital employed.

18.     At the time of the acquisition in 2018, DCC Plc had four divisions: LPG (a leading liquefied petroleum gas sales and marketing business, with a developing business in the retailing of natural gas and electricity); Retail & Oil (a leader in the sales, marketing, and retailing of transport and commercial fuels, heating oils, and related products and services); Healthcare (a leading healthcare business, providing products and services to healthcare providers and health and beauty brand owners); and Technology (a leading route-to-market and supply chain partner for global technology brands).  Today, it operates three divisions: Energy; Healthcare; and Technology.

19.     Although the initial conversations with Ennis involved Stampede's business in the UK, DCC Plc soon became interested in Stampede's operations in North America and sought to acquire Stampede.

20.     At the time in 2017, DCC Plc had started its expansion into North America through its other divisions, but DCC Plc's Technology Group did not have any

presence in North America.  Stampede was the first acquisition for the Technology Group in North America.

21.     Plaintiffs and DCC Plc engaged in extensive negotiations over the course of more than six months regarding the proposed acquisition.

22.     A significant portion of those negotiations concerned the earn-out payments that Plaintiffs would receive following closing.  Approximately half of the document negotiation time was spent on the earn-out issue, resulting in an exceptionally complex formula.

23.     A major point of contention among the parties was the value of Stampede.  Using an earn-out formula allowed the parties to resolve the disputed value issue by reference to the companies' performance after the acquisition.

24.     DCC Plc's senior representative through the negotiation process was Ennis.  However, Ennis left DCC Plc shortly before the deal closed and was replaced by Tim Griffin, who is now the Managing Director of DCC Plc's Technology Group.

25.     Just days prior to the closing, Steve Casey, the Finance Director of DCC's Technology Group and employee of DCC Plc, demanded a dramatic change to the earn-out payment, increasing the earn-out period by 50% from two to three years and increasing the value put at risk in the earn-out, relative to the closing price, by the same 50%.  This change would also reduce the base closing payment by 12.5%.

26.     This demand further heightened the importance of the earn-out formula.

**B.     DCC Makes Specific Promises in the Stock Purchase Agreement**

27.     Following these extensive negotiations, Plaintiffs agreed to sell their shares in SGH to DCC.

28.     Plaintiffs, DCC, and Exertis UK entered into a Stock Purchase Agreement ("SPA") dated July 12, 2018.

29.     Under the SPA, DCC agreed to pay Plaintiffs a defined "Purchase Price" comprised of a "Closing Seller Payment" and "Earn-out Payments."  (SPA § 1.2).[1]

30.     Earn-out Payments were to be made over the course of three years, covering the fiscal years from July 1, 2018 through June 30, 2021.  Each year, three Estimated Quarterly Earn-out Amount payments were to be made 30 days after the close of each quarter, with a fourth True-up Amount payment due 60 days after the end of each year.  (SPA at 9-11; *see also* SPA § 1.4(b)).

31.     The amount of the Earn-out Payments is determined by a complex formula, the primary component of which is "Adjusted EBITA," which means "with respect to any Earn-out Period, the net income of the Earn-out Group for such period before interest expense, income taxes, and amortization of intangible assets," subject to certain adjustments and exclusions.  (SPA § 1.4(a)).[2]

32.     The Earn-out Payments are subject to a multiplier of either 7.25 or 8.0 depending on the aggregate growth rate year-to-year.  (SPA at 7, 10, 11).

---

[1] Capitalized terms hereinafter appearing in this Complaint reflect defined terms used in the SPA unless otherwise noted.

[2] The "Earn-Out Group" is defined as SGH, SPP, and Stampede Presentation Products (Canada) Inc.  (SPA at 7, 66).

33.     At the close of each Annual Earn-out Period, DCC was obligated to submit an "Earn-out Statement," with supporting documentation, reflecting its Earn-out Payment calculations.  (SPA § 1.4(d)).  Plaintiffs may then submit an "Earn-out Notice" identifying disputed accounting items.  (*Id.*).  Any disputed accounting items that are not resolved by agreement may then be submitted to Independent Accountants.  (*Id.*).

34.     Recognizing that post-closing business decisions would have a significant impact on the Earn-out Payments, Plaintiffs demanded a set of covenants regarding post-closing conduct of the business that are material to the present action.

35.     First, DCC promised to "act in good faith in continuing to operate the Earn-out Group in the ordinary course consistent with past practice (but subject to the DCC Conduct of Business guidelines) with the goal of maximizing profits consistent with the medium-term development of Stampede and shall not, directly or indirectly, take any actions that have the sole purpose of avoiding or minimizing the Earn-out Payments hereunder (in each case subject always to Buyer, acting in the best interests of the Earn-out Group and its Affiliates, not being prevented from taking or omitting to take any action for bona fide commercial or internal compliance reasons or as may be required by applicable Law)."  (SPA § 1.4(f)(i)).

36.     Second, DCC promised that it "shall not, and shall not cause the Earn-Out Group to, take any action with the purpose of materially and adversely affecting the business of the Earn-Out Group or its relationship with vendors and customers."  (SPA § 1.4(f)(iv)).

37.     Third, DCC promised that it "shall, and shall cause its Affiliates to, (A) refer to the Earn-out Group all revenue opportunities in North America within the

scope of the Restricted Business stemming from their businesses outside of North America, and (B) not take any action intended to divert revenue in North America within the scope of the Restricted Business away from the Earn-Out Group to any other Affiliate of Buyer." (SPA § 1.4(f)(v)).[3]

38.     DCC further agreed to indemnify Plaintiffs from "any and all Losses incurred or sustained by, or imposed upon, [Plaintiffs] based upon, arising out of, with respect to or by reason of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [DCC] pursuant to this Agreement."  (SPA § 8.4).

39.     The term "Losses" is defined as "losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that 'Losses' shall not include lost profit, punitive, exemplary or similar special damages or damages which are not reasonably foreseeable under applicable Law, except in

---

[3] The SPA provides: "Affiliate of a person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term 'control' (including the terms 'controlled by' and 'under common control with') means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. With respect to any natural Person, 'Affiliate' shall include such Person's spouse, children, parents and siblings."  (SPA at 65).

"Restricted Business" means "the wholesale distribution and sale of electronic professional audio visual equipment (e.g., large format displays, projectors, lamps, video conferencing equipment, professional audio equipment and associated accessories such as drones, brackets and cables) to trade resellers. For purposes of clarity, the Restricted Business shall not include engaging in (i) the resale or sale of such equipment directly to end-users as a re-seller, retailer, integrator or systems contractor or (ii) the manufacture or assembly of such equipment."  (SPA at 72).

the case of fraud or to the extent actually awarded to a Governmental Authority or other third party."  (SPA at 70).

40.     Exertis UK agreed to "absolutely and unconditionally guarantee the full and timely payment and performance of the obligations of" DCC under the SPA.  (SPA § 9.13(a).

41.     The SPA is "governed by and construed in accordance with the internal laws of the State of Delaware."  (SPA § 9.9(a)).

42.     DCC and Exertis UK agreed to "submit to the sole and exclusive jurisdiction of the Federal courts of the United States of America or the courts of the state of Delaware."  (SPA §§ 9.9(b), 9.13(c)).

43.     Immediately after execution of the SPA, Kelly and SGH executed an Amended and Restated Employment Agreement dated July 12, 2018 ("Employment Agreement").

44.     Kelly agreed to serve as CEO and President of SGH for an initial term of three years.  (Employment Agreement § 2).

45.     For a period of two years following termination of his employment, Kelly agreed not to engage in "Restricted Business," a term defined in the Employment Agreement in a manner substantially similar to the definition contained in the SPA. (Employment Agreement §§ 5(b), 6(f)).

46.     Wilkins retired from Stampede immediately following the acquisition.

**C.     DCC Engages in a Course of Conduct Aimed at Minimizing Earn-Out Payments**

47.     As part acquisition negotiations, DCC required that SGH create a new position, Senior Vice President of Finance, at SGH and that the existing Vice President of Finance would report into this new person.

48.     On the day of closing, DCC unexpectedly announced that its candidate to fill the new position, Alexis Spencer, the Finance Director from DCC Technology Group's France business, was in Buffalo looking at real estate with his wife.

49.     After negotiations between DCC Plc and Spencer collapsed, DCC installed Denis Tobin as SGH's Senior Vice President of Finance.

50.     Tobin previously served as a Corporate Finance Executive and focused on mergers and acquisitions work for DCC Affiliates, but lacked significant management experience having never served as the head finance person of an operating company.

51.     Stephen Casey, Tobin's manager at DCC Plc, shared that Tobin was known to have "sharp elbows" and that they were in the process of finding a new position for him.

52.     Under the SPA, Adjusted EBITA was to be determined in accordance with Generally Accepted Accounting Principles, "applied and calculated in a manner consistent with the EBITA calculation" derived from Stampede's 2017 audited financial statements.  (SPA, at 4).

53.     Tobin, however, ignored the SPA and moved quickly to implement significant changes to the Earn-out Group's accounting practices (and, consequently, DCC's calculation of Adjusted EBITA for purposes of the Earn-out Payments) that differed from the calculations used in Stampede's 2017 audited financial statements.

54.     As evidenced by their consequences, the purpose of these changes was to improve DCC's calculation of its return on capital employed, a metric prioritized by senior leadership at DCC Plc.

55.     As stated in DCC Plc's 2022 annual report, return on capital invested is "the key financial benchmark we use when evaluating both the performance of existing businesses and potential investments and is a key component of DCC's executive bonus plans and Long-Term Incentive Plan."

56.     At relevant times, DCC and its Affiliates provide a bonus structure under which executives are granted payments ranging from 50% to as much as 100% of their annual salary by meeting certain financial metrics.  In many cases, the bonus does not increase significantly even if an executive overachieves the metric threshold.

57.      This bonus structure incentivizes executives to hide profits that were earned in a particular period on a company's balance sheet so that they may be released to the income statement in a subsequent period, when needed to achieve the monthly or annual budget.

58.     Toward this end, a "buckets" spreadsheet was maintained to track where on the Earn-out Group balance sheets various excess reserves had been hidden and where they could be released from in later reporting periods.

59.     On or about March 29, 2021, a DCC representative said they would be using "two sets of books" through the remainder of the Earn-out Period.

60.     As a result of this "buckets" approach, the Earn-out Group's income statements failed to accurately reflect profits, and the Adjusted EBITA figures calculated for purposes of determining the Earn-out Payments were artificially reduced.

61.     Despite DCC's promises to "act in good faith in continuing to operate the Earn-out Group in the ordinary course consistent with past practice," and to act "with the goal of maximizing profits consistent with the medium-term development of" Stampede, (SPA § 1.4(f)(i)), DCC weaponized its internal audit team to identify opportunities to seek the institution of new accounting policies that reduce the Earn-out Payments.

62.     Throughout this process, Tobin along with DCC Plc representatives insisted on imposing "DCC Technology Group policies" without reference to the terms of the SPA.

63.     DCC took numerous steps to artificially lower Adjusted EBITA, including but not limited to the following examples:

a.     accounting for vacation accruals for employees in the United States in a manner inconsistent with past practice;

b.     accounting for freight accruals in a manner inconsistent with past practice;

c.     accounting for rebate accrual in a manner inconsistent with past practice;

d.     arbitrarily and excessively increasing reserves for older inventory;

e.     arbitrarily and excessively increasing bad debt reserves;

f.     arbitrarily including both errors and omissions; and

g.     failing to recognize the value of goods received but not invoiced.

64.     Some of the foregoing issues, as related to the Year One Earn-out Payment, were submitted to and decided by the Independent Accountants under SPA §

1.4(d).  Certain disputed accounting items related to Year Two and Year Three Earn-out

Payments are also potentially subject to decision by the Independent Accountants.[4]

65.    SPA § 1.4(d) does not apply generally to any and all claims arising out

of the SPA, but is instead limited to discrete accounting issues regarding "the calculation of

the Earn-out Payments" that are suitable for determination by an accountant.

66.    The claims advanced in this Complaint are not based on disputed

accounting items covered by SPA § 1.4(d).

67.    DCC refused to reconcile between past practice and its new approach

in making Earn-out Payments.

68.    DCC made late Quarterly Earn-out Payments for the first two quarters

of Year One, the first quarter of Year Two, and the first two quarters of Year Three.  It

made late True-up payments in Year One and Year Three.  DCC made no Quarterly Earn-

out Payments in the second and third quarters of Year Two, and no True-up payment in

Year Two.  Accordingly, DCC made only two out of twelve payments in compliance with

the deadlines set forth in SPA § 1.4(b).

69.    On or about July 9, 2021, Tobin, as the Finance Director of the

International unit of DCC Plc's Technology Group, inserted himself into SGH's monthly

financial close process for June 2021, which was the last month of the Earn-Out Period.

Tobin directed Stampede's finance team to make numerous changes to the financial

---

[4] Following the parties' agreement to extend the SPA deadlines regarding the Year
Two Earn-out Notice, the Year Two Earn-out Statement and Earn-out Notice remain open
issues and have not been submitted to the Independent Accountants.  Plaintiffs issued an
Earn-out Notice regarding DCC's Year Three Earn-out Statement on July 1, 2022.

statements for that month that were prepared in the ordinary course of business, resulting in the reduction of the Earn-Out Payment by more than $700,000.

70.     When Stampede staff inquired as to the impact of one of his actions on Plaintiffs, Tobin responded with, "What can he [Kelly] do about it?"

71.     On information and belief, Tobin's actions were supported by other members of senior management at DCC Plc.

72.     After approximately two years in the role of Senior Vice President of Finance at Stampede, Tobin was promoted the role of Finance Director for the International unit of DCC's Technology Group.

73.     Clive Fitzharris, the Managing Director of the International unit of DCC Plc's Technology Group, indicated that only a small group at DCC's corporate headquarters were involved in the Stampede Earn-Out matter, including himself; Tobin; Andrew Trusdale, Development Director of the Technology Group; Conor Murphy, Director of Group Finance of DCC Plc; Kevin Lucey, Chief Finance Officer of DCC Plc; Donal Murphy, Chief Executive Officer of DCC Plc; and to a much lesser extent Griffin and Leslie Deacon, Finance Director of the Technology Group.

**D.     DCC Breaches the SPA by Diverting and Failing to Refer Restricted Business**

74.     Stampede was the first acquisition in North America by DCC's Technology Group.  Due to Stampede being the leading value-added distributor of Pro AV products in North America, DCC covenanted that all Restricted Business opportunities within North America would be referred to and not diverted from Stampede.

75.     DCC and its Affiliates were obligated to: "(A) refer to the Earn-out Group all revenue opportunities in North America within the scope of the Restricted

- 14 -

Business stemming from their businesses outside of North America, and (B) not take any action intended to divert revenue in North America within the scope of the Restricted Business away from the Earn-Out Group to any other Affiliate of Buyer."  (SPA § 1.4(f)(v)).

76.    But in September 2018, just months after the SPA was executed, DCC or an Affiliate acquired Jam Industries Ltd. and Jam International Ltd. (collectively, "JAM"), entities with significant business within the scope of the Restricted Business.

77.    Unbeknownst to Plaintiffs, DCC Affiliates were in the process of pursuing and acquiring JAM no later than January 2018, while the SPA was being negotiated.

78.    DCC and/or its Affiliates pursued the acquisition of JAM's Pro AV business with the intent of bolting it on to SGH, which was to take the role of its Pro AV platform company.  This business falls within the scope of the Restricted Business.

79.    On information and belief, JAM generates approximately $100 million in annual revenues from Pro AV business falling within the scope of the Restricted Business.

80.    The acquisition and operation of JAM through entities that are not members of the Earn-Out Group constitute breaches of SPA § 1.4(f)(v).

81.    In November 2020, DCC or an Affiliate acquired The Music People, Inc. ("TMP").

82.    On information and belief, TMP generates approximately $100 million in annual revenues from Pro AV business falling within the scope of the Restricted Business.

83.    The acquisition and operation of TMP through entities that are not members of the Earn-Out Group constitute breaches of SPA § 1.4(f)(v).

84.     In addition to these acquisitions, DCC's Supply Chain Services ("SCS") division (now known as Exertis Global Operations) failed to refer and diverted revenue opportunities in North America within the scope of the Restricted Business.

85.     For example, in May 2020, SCS agreed to provide distribution services for Pro AV business falling within the scope of the Restricted Business to Clear Touch Interactive Inc. ("Clear Touch").

86.     DCC acknowledged that SCS business with Clear Touch constituted a "revenue opportunity" under the SPA.

87.     On information and belief, SCS failed to refer and diverted revenue of more than $7 million per month during the Earn-out Period from Pro AV business falling within the scope of the Restricted Business.

88.     The failure to refer and diversion of SCS revenue opportunities falling within the scope of the Restricted Business constitute breaches of SPA § 1.4(f)(v).

89.      Finally, DCC failed to refer and diverted revenue opportunities from other Affiliates who sell products falling within the scope of the Restricted Business into North America.

90.     The failure to refer and diversion of revenue opportunities falling within the scope of the Restricted Business constitute breaches of SPA § 1.4(f)(v).

91.     Plaintiffs have repeatedly requested information from DCC regarding revenues from JAM, TMP, SCS, and DCC's other Affiliates, including written requests made on November 4, 2021; December 15, 2021; and June 9, 2022.

92.     DCC has refused to provide Plaintiffs with information the requested revenue information, including written responses made on November 11, 2021; December 15, 2021; and June 9, 2022.

93.     The foregoing Restricted Business revenues should be included in determining Plaintiffs' Earn-out Payments.

**E.     DCC Breaches the SPA by Purporting to Enforce a Non-Binding Memorandum**

94.     In 2019, SPP sought to enter into an agreement with Furrion Limited ("Furrion"), a leading manufacturer of recreational vehicle ("RV") electronics equipment, under which SPP would become Furrion's exclusive distributor.

95.     SPP had an existing supplier relationship with Furrion relating to its consumer electronics product line, and earned an opportunity to expand into Furrion's much larger RV business.

96.     The agreement with Furrion's RV division would produce significant revenues that would total in excess of $100 million dollars annually and was considered to be the largest deal ever won by DCC's Technology Group.

97.     SPP would purchase approximately $55 million in goods, hire forty additional employees, operate its own fleet of trucks, and expand its warehouse operations by adding 300,000 square feet across multiple buildings.

98.     At the eleventh hour of the contract process, DCC withheld its support and demanded Plaintiffs sign a memorandum of understanding ("MOU") before SPP executed the Furrion contract.

99.     By its terms, the MOU is not a binding contract.

100.     The MOU's header states that it is "SUBJECT TO CONTRACT."

101.    The MOU "sets out the proposed terms" of a "variation to the [SPA] and the status of the Year One Earn-out Notice."

102.    Those proposed terms included a $1 million deduction in the Year Three Earn-out Payment, and retention of "70% of the earn-out delta related to the Furrion investment" that would be forfeited if the (as yet unexecuted) Furrion contract were terminated.

103.    The MOU states that these proposed terms would be "put into legal form and executed by the parties."

104.    Despite numerous attempts and extensive negotiations, the parties were not able to reach mutually acceptable terms regarding the Furrion transaction and never amended the SPA accordingly.

105.    Among the disputed issues was a 3% reserve for aged inventory, the treatment of goods received but not invoiced in financial statements, a late payment clause, specific treatment for different forms of termination of the Furrion contract, and treatment of any withholding if a new Furrion contract were formed.

106.    The agreement between SPP and Furrion provided for a manufacturer buyback of inventory after six months, and thus there was no basis for a reserve for aged Furrion-related inventory aside from its negative impact on the Earn-out payments.

107.    Further, a termination of the Furrion contract that was beneficial to Stampede would offer no logical basis for forfeiture of Earn-out Payments.

108.    On or about January 14, 2021, Fitzharris acknowledged Furrion-related goods received but not invoiced were received in the Year Two Earn-out Period, but resisted releasing the value of those goods on financial statements.

109. Fitzharris further stated on or about May 5, 2021, that he would rather give the value of those goods back to Furrion than have them included in the Earn-out Payment.

110. On or about June 3, 2021, Fitzharris commented that DCC would not "put anything through the books" related to those goods.[5]

111. On or about June 9, 2021, with just weeks to go before the end of the Earn-out Period, DCC provided a draft proposed amendment to the SPA. Even at that late date, the written draft was described as "non-legal."

112. Plaintiffs did not approve that proposed amendment.

113. Fitzharris inserted himself into the Furrion relationship and made several requests of the financial partner that owned a minority stake in Furrion. These requests included converting the loans made to Furrion to equity, replacing Furrion's CFO, and putting more capital into the business.

114. As a result of these DCC demands, the founder and majority owner of Furrion lost control of the company, which paved the way for the minority owner to sell the company to a third party, Lippert Components, Inc. ("LCI").

115. The purchase by LCI resulted in termination of the exclusive distribution deal between Furrion and SPP.

116. The Furrion deal was tremendously successful, resulting in more than $237 million in revenues and more than $19.5 million in profits for SPP.

---

[5] A dollar value for Furrion-related goods received but not invoiced was eventually included in the Year Three Earn-out Statement as an "add back," but not included in financial statements during the Earn-out Period.

117.    Further, when Furrion was acquired by LCI with an effective date of October 17, 2021, SPP was paid more than $39 million for inventory, accounts receivable, reimbursement of deposits to suppliers, and expenses, and received a $5 million break-up fee, $2.6 million in additional funds to cover the budgeted profits for the remaining six months of DCC's fiscal year, and reimbursement for inbound freight and pallets.

118.    These revenues were not reflected in the Earn-out Payments because the contract between Furrion and SPP was terminated just a few months after the end of the Earn-out Period.

119.    The transaction that ultimately occurred between SPP and Furrion differed significantly from the transaction anticipated at the time of the MOU. DCC expected that the transaction would require more than $50 million in capital, but the total actual investment in the business was less than $15 million.

120.    Despite DCC's continued awareness and acknowledgement to the contrary, it has attempted to treat the MOU as a binding contract by deducting a $1 million fee from the Earn-out Payments. Fitzharris indicated that the non-binding nature of the MOU was a "foregone conclusion."

121.    DCC has further reduced the Year Two and Year Three Earn-out Payments by approximately $2 million, claiming that such withholding is permitted by the MOU and that these funds were forfeited when the Furrion contract was terminated.

122.    The SPA does not provide for these reductions.

123.    DCC's refusal to pay these amounts constitutes a breach of the SPA.

**F.      DCC Breaches the SPA by Requiring SPP Return COVID Relief Funds and Failing to Address COVID-Related Business Disruptions**

124.    DCC promised to "act in good faith in continuing to operate the Earn-out Group in the ordinary course consistent with past practice," to act "with the goal of maximizing profits consistent with the medium-term development of" Stampede, and to refrain from taking "any actions that have the sole purpose of avoiding or minimizing the Earn-out Payments."  (SPA § 1.4(f)(i)).

125.    DCC further promised that it would not "take any action with the purpose of materially and adversely affecting the business of the Earn-Out Group or its relationship with vendors and customers."  (SPA § 1.4(f)(iv)).

126.    In 2020, during the height of the COVID pandemic worldwide lockdowns, DCC Plc made three transfers of cash from Stampede to DCC Plc's treasury accounts in Ireland totaling approximately $12 million.  Since the acquisition, DCC Plc had refrained from providing cross corporate guarantees to Stampede's suppliers.

127.    In 2020, with the support and approval of John Dunne, the Chief Commercial Officer of DCC Plc North America, who was also serving in the role of SGH's Senior Vice President of Finance, SPP applied for COVID-relief funds through the Paycheck Protection Program.

128.    The U.S. Department of the Treasury approved SPP's application. Based on the additional support and approval from Fitzharris, Stampede's finance team took the steps necessary to receive the $2.4 million in funding from the U.S. Department of Treasury.

129.    A second draw of $2.4 million was also available under the program.

130.     After SPP received these funds, Tobin, serving in the newly created role of Finance Director of the International unit of DCC Plc's Technology Group, insisted they be returned to the U.S. Department of the Treasury.

131.     At DCC's direction, SPP returned those funds.

132.     Although DCC provided a pretextual and legally incorrect reason for requiring SPP to return the funds, on information and belief, DCC's true reason was to negatively impact the Earn-out Payments.

133.     Without these funds, the fourth quarter for the Year Two Earn-out Period (the "COVID Quarter") had a disproportionate and unexpected effect on the Earn-out Payments.

134.     Through the first three quarters of the Year Two Earn-out Period, Earn-out Group EBITA increased by 25%.  But in the COVID Quarter EBITA dropped by 50%, resulting in a total change in EBITA for the Year Two Earn-out Period of just 2%.

135.     With that 2% growth in EBITA, the Earn-out Payments would be reduced by 78% for Year Two as compared to Year One.

136.     Indeed, the COVID Quarter impact caused the Earn-out Payment calculations to yield a negative number in certain months - an absurd result under which Plaintiffs would have to pay DCC for buying their company.

137.     The parties did not and could not have reasonably anticipated this impact at the time the SPA was executed.

138.     The parties mutually understood that the Earn-out Payments would be based on twelve quarters of business activity.

139.     Trusdale promised that DCC would not use the COVID Quarter as a basis to prevent Plaintiffs from qualifying for an Earn-out Payment multiplier of 8.0 (rather than 7.25), and advised that this position was backed by Griffin, the Managing Director of DCC Plc's Technology Group.

140.     The parties discussed several potential means of addressing the unanticipated effect of the COVID Quarter, including omitting that quarter from Earn-out Payment calculations, normalizing the calculations based on the remaining quarters, or making other adjustments to account for this unexpected occurrence.

141.     Despite its promises and acknowledgment that Plaintiffs should be eligible for an Earn-out Payment multiplier, DCC has refused to address the unexpected impact of the COVID Quarter in its Earn-out Payment calculations.

**G.    DCC Induces Plaintiffs to Sell Aged Inventory at a Loss, then Breaches its Commitment Regarding Inventory Reserves**

142.     DCC pressured Kelly to precipitously reduce aged inventory held by SPP through the establishment of monthly, biweekly, and weekly meetings between DCC and Stampede management that monitored the progress of liquidation efforts, and by establishing specific bonuses for SPP senior management, sales personnel, and product management staff.

143.     To induce Kelly to take these actions, DCC consistently promised that it would waive any right to reserve 3% of the value of inventory for purposes of Adjusted EBITA.

144.     DCC did not impose the 3% reserve for the Year One and Year Two Earn-out Periods.

145. On or about January 14, 2021, Fitzharris promised that DCC would not impose the 3% reserve for the Year Three Earn-out Period if the aged inventory were dealt with in a manner similar to the prior years.

146. In reliance on DCC's promise, Kelly elected to dramatically reduce aged inventory during the Earn-out Period pursuant to his authority under the SPA and the Employment Agreement.

147. This hurried liquidation resulted in a loss of $4.2 million during the Earn Out Periods.

148. However, even though Kelly performed his end of the bargain, DCC insisted on reserving 3% of the value of inventory in determining Adjusted EBITA for the Year Three Earn-out Period.

149. On or about August 30, 2021, Trusdale acknowledged that he had promised DCC would not "double dip" by imposing the 3% reserve after obtaining a reduction in aged inventory numerous times in the past.  He reiterated that commitment and noted that Fitzharris would "kill" him for making the acknowledgment.  Fitzharris, who was present for this call, did not object.

150. This reserve improperly lowered Adjusted EBITA by approximately $1.3 million.

## H.     DCC's Concerted Efforts Improperly Lower Plaintiff's Earn-Out Payments

151. DCC representatives took a systematic approach to reducing the Earn-out Payments in order to reduce the price paid for Stampede.

152.    DCC representatives routinely ignored the terms of the SPA such that Kelly was forced to provide PowerPoint presentations to explain various contract terms and conditions at various times during the Earn-out time period, which were generally ignored.

153.    DCC's improper actions and breaches of the SPA have had a compound effect in reducing the Earn-out Payments.

154.    The Earn-out Payment multiplier for the Year Two and Year Three Earn-out Periods is 8.0 rather than 7.25 when the accounting for DCC's breaches. Additionally, the Earn-out Payment multiplier for the Year One Earn-out Period is 8.0 rather than 7.25 under the Make-Up Amount formula contained in the SPA.  (*See* SPA at 9).

155.    During the Earn-out Period, the business of the Earn-out Group prospered.  Revenue of the Earn-out Group grew from approximately $289 million to approximately $444 million.  Earnings before interest and tax grew from approximately $8.1 million to approximately $12.4 million.

156.    DCC representatives acknowledged this positive performance and the impact of Kelly in achieving it.  For example, Griffin said that Kelly performed as a "true professional" and was "impeccable" in his position of President and CEO throughout the Earn-out Period.  Fitzharris stated that Kelly's performance was "exemplary," that he was a "huge fan," and it was a "pleasure" working together.

157.    Despite this indisputable success, DCC has engaged in extensive efforts to reduce Plaintiffs' Earn-out Payments without regard for the terms of the SPA.

158.    As of June 30, 2018 (the SPA closing date), the total valuation for the Earn-out Payments was approximately $13 million.

159.     DCC now claims that the total due for all Earn-out Payments is less than $10 million (only 77% of the original valuation) even though the performance of the Earn-out Group during the Earn-out Period exceeded all growth expectations by delivering more than 150% of the company revenues and earnings before interest and tax in the final year.

160.     The result of the various manipulations was that DCC paid out only 77% of original Earn-Out valuation even though Stampede's annual performance improved by 150%.

**FIRST CAUSE OF ACTION**
**(Breach of Contract - SPA)**
**(Against DCC)**

161.     The previous allegations are realleged and incorporated herein by reference.

162.     Plaintiffs and DCC, for valuable consideration, entered into a valid and enforceable SPA on or about July 12, 2018.

163.     Plaintiffs have performed their obligations under the SPA.

164.     DCC has breached its obligations under the SPA by failing to make proper Earn-out Payments as described above.

165.     DCC breached the covenants contained in SPA §§ 1.4(f)(i), (iv), and (v) as described above.

166.     DCC breached the SPA by making improper Earn-out Payments.

167.     As a result of DCC's breaches, Plaintiffs have been damaged in an amount in excess of $20 million.

168.     DCC is entitled to specific performance under the SPA of DCC's

obligations to make proper Earn-out Payments and indemnify Plaintiffs for Losses,

including attorneys' fees, incurred as a result of DCC's breach.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against DCC)**

169.     The previous allegations are realleged and incorporated herein by

reference.

170.     Plaintiffs and DCC, for valuable consideration, entered into a valid

and enforceable SPA on or about July 12, 2018.

171.     Plaintiffs have performed their obligations under the SPA.

172.     DCC breached the implied covenant of good faith and fair dealing by

depriving Plaintiffs of their bargained for consideration under the SPA, as described above.

173.     DCC exercised its rights under the SPA malevolently as part of a

scheme to realize gains the contract implicitly denies as described above.

174.     DCC exercised discretion afforded under the SPA in an arbitrary,

irrational, or illegitimate manner for its own gain at Plaintiffs' expense as described above.

175.     As a result of DCC's breach, Plaintiffs have been damaged in an

amount in excess of $20 million.

## THIRD CAUSE OF ACTION
**(Breach of Contract - Inventory Reserve)**
**(Against DCC)**

176.     The previous allegations are realleged and incorporated herein by

reference.

177.    Plaintiffs and DCC, for valuable consideration, entered into a valid and enforceable agreement under which Plaintiffs agreed to reduce aged inventory and DCC agreed to waive any right to reserve 3% of inventory value.

178.    Plaintiffs have performed their obligations under that agreement.

179.    DCC has breached its obligations under that agreement by reserving 3% of inventory value.

180.    As a result of DCC's breach, Plaintiffs have been damaged in an amount in excess of $4.2 million.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel)
### (Against DCC)

181.    The previous allegations are realleged and incorporated herein by reference.

182.    DCC made a clear and unambiguous promise that if Plaintiffs agreed to reduce aged inventory, DCC would waive any right to reserve 3% of inventory value.

183.    Plaintiffs acted in reliance on DCC's promise by reducing aged inventory.

184.    Plaintiffs' reliance was reasonable and foreseeable.

185.    Plaintiffs have been damaged in an amount in excess of $4.2 million due to reliance on DCC's promise.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against DCC)

186.    The previous allegations are realleged and incorporated herein by reference.

187.    In the alternative to the Third Cause of Action, if it is determined that there is no enforceable contract between Plaintiffs and DCC regarding the inventory reserve, Plaintiffs are entitled to recover under the doctrine of unjust enrichment.

188.    Plaintiffs conferred a benefit upon DCC by reducing aged inventory.

189.    DCC was enriched by virtue of Plaintiffs reducing aged inventory.

190.    DCC was aware that Plaintiffs were not providing this benefit gratuitously.

191.    DCC has accepted and retained that benefit inequitably and at Plaintiffs' expense.

192.    It is against equity and good conscience to permit DCC to retain the benefit that Plaintiffs provided.

193.    Plaintiffs have been damaged in an amount in excess of $4.2 million due to DCC's retention of this benefit.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment)**
**(Against DCC)**

194.    The previous allegations are realleged and incorporated herein by reference.

195.    The MOU is not a binding or enforceable agreement.

196.    DCC has attempted to enforce the MOU by deducting approximately $3 million from the Earn-out Payments.

197.    An actual, present and justiciable controversy has arisen between Plaintiffs and Defendants regarding the enforceability of the MOU.

198.     Plaintiffs seek declaratory judgment from this Court that the MOU is not enforceable.

### SEVENTH CAUSE OF ACTION
**(Reformation)**
**(Against DCC)**

199.     The previous allegations are realleged and incorporated herein by reference.

200.     Plaintiffs and DCC entered into the SPA with the mutual understanding that the Earn-out Payments were to be based on twelve quarters of business activity.

201.     This understanding was a basic assumption going to the foundation of the SPA.

202.     As a result of the unforeseen effects of the COVID Quarter, Plaintiffs were denied the benefit of their bargain and effectively received Earn-out Payments based on fewer than twelve quarters of business activity.

203.     DCC acknowledged that the unforeseen effects of the COVID Quarter required adjustment of the SPA to avoid absurd consequences, including Earn-out Payment calculations that yielded negative numbers.

204.     DCC further promised that it would not use the COVID Quarter to deny Plaintiffs an 8.0 Earn-out Payment multiplier.

205.     However, DCC refused to follow through on its acknowledgment and promises to address the impact of the COVID Quarter.

206.    As a result, Plaintiffs respectfully requested that the Court reform the SPA so that it accurately expresses the parties' mutual intention at the time of execution, by normalizing Earn-out Payments to account for the COVID Quarter.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract - Guarantee)
### (Against Exertis UK)

207.    The previous allegations are realleged and incorporated herein by reference.

208.    Plaintiffs and Exertis UK, for valuable consideration, entered into a valid and enforceable SPA on or about July 12, 2018.

209.    This Complaint serves as written notice to Exertis UK regarding DCC's failure to discharge its obligations under the SPA.

210.    Plaintiffs have performed their obligations under the SPA.

211.    Exertis UK has breached its obligations under the SPA by failing to make full and timely payment and performance of the obligations of DCC under the SPA.

212.    As a result of DCC's breach, Plaintiffs have been damaged in an amount in excess of $24.2 million.

## JURY DEMAND

PLEASE TAKE NOTICE THAT Plaintiffs hereby demand a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiffs hereby demand:

A.    General and compensatory damages against Defendants in an amount exceeding $24.2 million, to be determined at trial;

- 31 -

B.      Recovery of Losses, including costs or expenses of whatever kind, reasonable attorneys' fees, and the cost of enforcing any right to indemnification as provided in the SPA;

C.      Pre- and post-judgment interest, costs, attorneys' fees, and disbursements in this action;

D.      A declaration that the MOU is not enforceable;

E.      An order requiring specific performance under the SPA of DCC's obligations to make proper Earn-out Payments and indemnify Plaintiffs for Losses incurred as a result of DCC's breach;

F.      An order reforming the SPA to accurately express the parties' mutual intention by normalizing Earn-out Payments to account for the COVID Quarter; and

G.      Such other and further relief as to the Court seems just and proper.

Dated:  Buffalo, New York
        July 6, 2022

PHILLIPS LYTLE LLP

By: _/s/ David J. McNamara_____
        David J. McNamara
        Joshua Glasgow
Attorneys for Plaintiffs
*Kevin Kelly and Mark Wilkins*
One Canalside
125 Main Street
Buffalo, New York 14203-2887
Telephone No. (716) 847-8400
dmcnamara@phillipslytle.com
jglasgow@phillipslytle.com

Doc #10518569