UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KEVIN KELLY and MARK WILKINS,

                              Plaintiffs,

v.                                                    **DECISION AND ORDER**
                                                       22-CV-518S

DCC TECHNOLOGY HOLDINGS, INC. and
EXERTIS (UK) LIMITED,

                              Defendants.

## I.    INTRODUCTION

In this diversity action, Plaintiffs Kevin Kelly and Mark Wilkins allege that Defendants DCC Technology Holdings, Inc. ("DCC"), and DCC's guarantor, Exertis (UK) Limited ("Exertis"), broke certain promises and covenants entered when DCC acquired Plaintiffs' company, Stampede Global Holdings, Inc.

Now pending before this Court is Defendants' motion to dismiss the complaint pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure or, in the alternative, to compel arbitration and stay further proceedings.[1]  (Docket No. 8.)  For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part, and their motion to compel arbitration and to stay further proceedings is denied.

## II.    BACKGROUND

This Court assumes the truth of the following factual allegations contained in the complaint.  See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S. Ct. 1848,

---

[1] In support of their motion to dismiss, Defendants filed a memorandum of law, the Declaration of Andrew Trusdale (with exhibits), and a reply memorandum of law.  (Docket Nos. 9, 10, 20.)  Plaintiffs filed a memorandum of law in opposition.  (Docket No. 16.)

48 L. Ed. 2d 338 (1976); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 63 (2d Cir. 1997).

## A.    The Parties

In 1997, Plaintiff Mark Wilkins co-founded and served as President and CEO of a company named Stampede Presentation Products, Inc. ("SPP"), which engaged in the wholesale distribution of video projectors.   See Complaint, Docket No. 1, ¶¶ 12, 14. Plaintiff Kevin Kelly joined SPP in 2001 as its Vice-President of Sales and Marketing, and later became President and COO in 2004.  Id. ¶ 13.

At some point, SPP came under the ownership of Stampede Global Holdings, Inc. Id. ¶ 11.   In 2018, Wilkins and Kelly were the sole shareholders of Stampede Global Holdings, Inc., which owned all of the outstanding equity of various related entities,[2] including SPP.  Id. ¶ 10.  For ease of reference, this Court will refer to Stampede Global Holdings, Inc., SPP, and all related entities collectively as "Stampede."

Over the course of two decades, Wilkins and Kelly built Stampede into the global leading distributor of value-added professional audio-visual and consumer electronics, with more than 200 employees worldwide, covering the United States, Canada, Latin America, Europe, Asia, and Australia, including 80 employees at its Buffalo, New York headquarters.  Id. ¶¶ 10, 14.  Stampede distributed audio equipment, audio receivers, cables and connectivity, classroom audio, digital signage, lamps, projectors, microphones, presentation accessories, and the like.  Id. ¶ 10.  It now provides global

---

[2] The related entities are Stampede Presentation Products (Canada) Inc.; Stampede Global Europe Ltd.; Diamond Lamps Pte Ltd.; Stampede Global UK Ltd.; Just Lamps Nordic AB; Just Lamps Pte Ltd.; Just Lamps Malaysia Sdn Bhd; and Just Lamps Australia Pty Ltd.  See Complaint, ¶ 11.

distribution services for consumer, business, and enterprise technology products from pioneering and industry-leading technology brands.  Id. ¶ 15.

DCC is a Delaware corporation owned by parent DCC Plc, an Irish holding company that is publicly traded on the London Stock Exchange and is a constituent of the Financial Times Stock Exchange (FTSE) 100 Index.  Id. ¶¶ 4, 16, 17.  Its revenues exceed $16 billion, and it employs 13,700 people in 20 countries.  Id. ¶ 17.  DCC Plc focuses its business on mergers and acquisitions of cash-generating businesses with high returns on capital employed.  Id. ¶ 17.  As relevant here, DCC Plc operates a technology division, which engages in route-to-market and supply-chain partnerships with global technology brands.  Id. ¶ 18.

**B.    DCC's Acquisition of Stampede and the Stock Purchase Agreement**

In October 2017, Kelly received a message from Niall Ennis, who served as Managing Director of DCC's Technology Group.  See Complaint, ¶ 16.  After discussing Stampede's business in the United Kingdom, Ennis relayed DCC Plc's interest in Stampede's North America business, and DCC Plc then sought to acquire Stampede.  Id. ¶ 19.  Stampede was DCC Plc's first North American acquisition for its Technology Group. Id. ¶¶ 20, 74.

Over the course of several months, Wilkins and Kelly negotiated the acquisition with Ennis.  Id. ¶¶ 21, 24, 27.  On July 12, 2018, Plaintiffs and Defendants entered into a Stock Purchase Agreement ("SPA").[3]  Id. ¶ 28.  Under the SPA, DCC agreed to pay

---

[3] A copy of the Stock Purchase Agreement is contained in the record at Docket No. 10-1.  Although not attached to the complaint, the agreement is properly considered because it is fully incorporated into the complaint by clear and substantial reference.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (stating that "[t]o

Wilkins and Kelly a defined "Purchase Price," which was comprised of a "Closing Seller Payment" and "Earn-out Payments."   Id. ¶ 29.   The earn-out payments are tied to Stampede's post-closing performance and are at issue here.   Id. ¶ 23.

During negotiations, Stampede's value was a major point of disagreement.   Id. ¶ 23.   The parties ultimately bridged the gap by agreeing to use earn-out payments in conjunction with a base purchase price.   Id. ¶¶ 23-26.   The SPA provides for earn-out payments to be made over the course of three years, covering the fiscal years from July 1, 2018, through June 30, 2021.  Id. ¶ 30.  Each year, three Estimated Quarterly Earn-out Amount payments were due at the close of the quarter, with a True-up Amount payment due 60 days after the end of each fiscal year.   Id.

The SPA provides that earn-out payments be calculated pursuant to a complex, heavily negotiated formula.  Id. ¶¶ 22-26, 31.  The formula is centered on the net income of the Earn-out Group, which consists of Stampede Global Holdings, Inc., SPP, and Stampede Presentation Products (Canada) Inc.   Id. ¶¶ 31, 32.   Exertis agreed to guarantee full and timely payment of DCC's financial obligations under the SPA.  Id. ¶ 40.

Because post-closing business decisions would materially impact the earn-out payments, Plaintiffs demanded a set of covenants regarding post-closing conduct of the business.  Id. ¶ 34.  The covenants implicated in the present action are as follows:

> DCC promised to "act in good faith in continuing to operate the Earn-out Group in the ordinary course consistent with past practice (but subject to the DCC Conduct of Business guidelines) with the goal of maximizing profits consistent with the medium-term development of Stampede and shall not, directly or indirectly, take any actions that have the sole purpose of avoiding or minimizing the Earn-out Payments hereunder (in each case subject always to Buyer, acting in the

be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents")(internal quotation and citation omitted).

best interests of the Earn-out Group and its Affiliates, not being prevented from taking or omitting to take any action for bona fide commercial or internal compliance reasons or as may be required by applicable Law);"

DCC promised that it "shall not, and shall not cause the Earn-out Group to, take any action with the purpose of materially and adversely affecting the business of the Earn-Out Group or its relationship with vendors and customers;"

DCC promised that it "shall, and shall cause its Affiliates to, (A) refer to the Earn-out Group all revenue opportunities in North America within the scope of the Restricted Business stemming from their businesses outside of North America, and (B) not take any action intended to divert revenue in North America within the scope of the Restricted Business away from the Earn-Out Group to any other Affiliate of Buyer;" and

DCC promised to indemnify Plaintiffs from ". . . any and all Losses incurred or sustained by, or imposed upon, [Plaintiffs] based upon, arising out of, with respect to or by reason of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [DCC] pursuant to this Agreement . . . ."

Id. ¶¶ 35-39.

Immediately after execution of the SPA, Kelly entered an agreement to serve as CEO and President of Stampede Global Holdings, Inc. for an initial 3-year period and agreed not to engage in defined "Restricted Business" for two years following termination of his employment.  Id. ¶¶ 13, 43-45.  Wilkins retired from Stampede immediately following the acquisition.  Id. ¶ 46.

## C.    Earn-out Payment Calculations and Dispute-Resolution Provision

Earn-out Payment calculations are governed by SPA § 1.4 (d).  Under that provision, DCC was obligated to deliver to Plaintiffs a written Earn-out Statement, with supporting detail, at the close of each Annual Earn-out period that contained its

"determination and calculation" of the year's earn-out payments.  Complaint, ¶ 33.  If Plaintiffs objected to any portion of the Earn-out Statement, they had 30 days to provide DCC written notice "specifying in reasonable detail the nature and, to the extent known, dollar amount of any such objections."  Id.  During the 30-day period, Plaintiffs had the right "to inspect the Earn-Out Group's books and records and work papers, in each case, relating to the calculation of the Earn-out Payments."  See SPA § 1.4 (d).  If Plaintiffs failed to provide written notice of objections within the 30-day time period, then the payments set forth in the Earn-out Statement were deemed final and binding.  Id.  If Plaintiffs provided written notice of objections and the parties failed to resolve the objections on their own, "all unresolved disputed items" were referred to Independent Accountants[4] who acted as arbitrators.  Id.

Plaintiffs allege that certain of their objections to the Year One Earn-out Statement were submitted to and decided by the Independent Accountants.  See Complaint, ¶¶ 63, 64.  They further maintain that "certain disputed accounting items" related to Years Two and Three Earn-out Statements are potentially subject to submission to and decision by the Independent Accountants.  Id. ¶ 64.  Plaintiffs insist, however, that the causes of action advanced in their complaint do not involve disputes subject to the SPA § 1.4 (d) dispute-resolution provision.  Id. ¶ 66.

## D.    Alleged Breaches of the Stock Purchase Agreement

Wilkins and Kelly maintain that DCC breached the SPA in multiple ways by systematically excluding funds from the earn-out payment formula and further engaging

---

[4] "Independent Accountants" is defined in SPA § 1.3 (b) as "the Chicago office of Deloitte or, if the Chicago office of Deloitte is unable to serve, [DCC] and [Plaintiffs] shall appoint by mutual agreement the office of an impartial, nationally recognized firm of independent certified public accountants other than any [of DCC's or Plaintiffs'] accountants."

in a multi-pronged scheme intended to minimize their earn-out payments.  See Complaint, ¶ 1.

They first allege that Denis Tobin, whom DCC installed as Stampede's Senior Vice-President of Finance post-acquisition, spearheaded a coordinated effort to use new accounting practices and policies to increase executives' bonuses and decrease Plaintiffs' earn-out payments.  Id. ¶¶ 47-73.  Tobin, for example, changed Stampede's accounting method for calculating its Adjusted EBITA[5] away from the Generally Accepted Accounting Principles mandated by the SPA.  Id. ¶¶ 31, 52-53, 62, 63, 67-70.  The purpose of this change in practice, which included hiding profits in one quarter for release in another and keeping two sets of books, was to improve DCC's internal metrics and boost executive bonuses, to the detriment of Plaintiffs' earn-out payments.  Id. ¶¶ 54-60.  Plaintiffs assert that by engaging in this conduct, DCC breached its promises to act in good faith to operate Stampede as it had been operated in the ordinary course and to act with the goal of maximizing profits.[6]  Id. ¶ 61.

Next, Wilkins and Kelly accuse DCC of diverting from or failing to refer "Restricted Business" to Stampede, thereby causing millions of dollars in revenues to be excluded from the earn-out payment calculations.  Id. ¶¶ 74-93.  In particular, Plaintiffs contend that revenues diverted to DCC or Affiliate entities Jam Industries Ltd., Jam International Ltd., and The Music People, Inc., were excluded from the calculations in violation of the SPA.  Id. ¶¶ 76-79, 81, 82.  And they further allege that DCC's Supply Chain Services division

---

[5] Adjusted EBITA is defined in SPA § 1.4 (a) as the net income of the Earn-out Group for a quarter before interest expenses, income taxes, amortization of intangible assets, and other specific adjustments.

[6] Plaintiffs admit that the Independent Accountants decided some of these issues for Year One under the SPA's dispute-resolution provision in § 1.4 (d).  See Complaint, ¶ 64.  Moreover, they concede that some of the issues relating to Year Two and Year Three earn-out payments also are potentially subject to submission and decision by the Independent Accountants.  Id.

and other Affiliates failed to refer or diverted revenue opportunities in North America.  Id. ¶¶ 84-89.  Plaintiff alleges that this conduct breaches the referral and non-diversion promises that DCC made in the SPA.  Id. ¶¶ 75, 80, 83, 88, 90.

Third, Plaintiffs allege that DCC breached the SPA by improperly enforcing a non-binding Memorandum of Understanding[7] ("MOU") relating to Stampede's business relationship with Furrion Limited, a leading manufacturer of recreation vehicle electronics equipment.  Id. ¶¶ 94-123.  Stampede sought to become Furrion's exclusive distributor. Id. ¶¶ 94, 95.  The Furrion deal was expected to produce revenues in excess of $100 million annually and was considered the largest deal ever won by DCC's Technology Group.  Id. ¶ 96.

Plaintiffs allege that DCC withheld its support for the deal at the eleventh hour and demanded that Plaintiffs execute the MOU as a variation to the SPA.  Id. ¶¶ 98, 101. According to Plaintiffs, the parties never finalized the MOU, yet DCC relied on it to reduce the earn-out payments.  Id. ¶¶ 99-113 , 118, 120-123.   Although the deal between DCC and Furrion ultimately terminated when a third-party purchased Furrion, Plaintiffs maintain that the deal nonetheless yielded $237 million in revenues and more than $19.5 million in profits for Stampede.  Id. ¶¶ 113-116.  Plaintiffs maintain that DCC's failure to include revenues from Furrion in the SPA's payment formulas violates the SPA.  Id. ¶¶ 117-123.

Wilkins and Kelly further allege that DCC breached the SPA and failed to act in good faith when navigating the effect of the COVID-19 pandemic on the SPA.  Id. ¶¶ 124-141.  Plaintiffs maintain that DCC improperly refused to accept COVID relief funds and

---

[7] The Memorandum of Understanding is contained in the record at Docket No. 10-5. Although not attached to the complaint, the MOU is properly considered because it is fully incorporated into the complaint by clear and substantial reference.  See ATSI Commc'ns, 493 F.3d at 98; DeLuca, 695 F. Supp. 2d at 60.

failed to fairly address the impact of COVID-related business and revenue disruptions on the SPA payment calculations. Id. ¶¶ 126-141.

Fifth, Wilkins and Kelly allege that DCC acted in bad faith when it applied a 3% reserve to aged inventory in the Year Three Earn-out Period, despite promising that it would waive its right to do so. Id. ¶¶ 142-150. Plaintiffs maintain that DCC induced Kelly to reduce aged inventory at a loss by promising to waive any right to reserve 3% of the value of inventory for purposes of calculating earn-out payments. Id. ¶¶ 142, 143, 145, 147. While DCC did not impose the 3% reserve for the Year One and Year Two Earn-out periods, it imposed it for the Year Three Earn-out period, contrary to its promise. Id. ¶¶ 144, 148. This reduced the Adjusted EBITA by $1.3 million. Id. ¶ 150.

In sum, Wilkins and Kelly allege that DCC employed a systematic approach to reduce their earn-out payments so that the ultimate price paid for Stampede would be lower. Id. ¶¶ 151-160.

### III.    DISCUSSION

Plaintiffs assert eight causes of action—seven against DCC and one against Exertis. The first cause of action alleges that DCC breached specific covenants in the SPA and failed to make or made improper earn-out payments, resulting in damages exceeding $20 million. See Complaint, ¶¶ 161-168. The second cause of action alleges that DCC breached the implied covenant of good faith and fair dealing by depriving Plaintiffs of their bargained-for consideration under the SPA, resulting in damages exceeding $20 million. Id. ¶¶ 169-175.

The third, fourth, and fifth causes of action assert breach-of-contract, promissory estoppel, and unjust enrichment claims relating to DCC's breach of the parties' agreement

that Kelly would reduce aged inventory in exchange for DCC's waiver of its right to reserve 3% of inventory value, resulting in $4.2 million in damages.  Id. ¶¶ 176-193.

The sixth cause of action seeks a declaratory judgment against DCC that the Furrion MOU is unenforceable.  Id. ¶¶ 195-198.  The seventh cause of action seeks reformation of the SPA to account for the COVID-19 pandemic disruption.  Id. ¶¶ 200-206.  The eighth cause of action alleges that Exertis, as guarantor, breached the SPA by failing to make full and timely payment and performance of DCC's obligations under the SPA, resulting in $24.2 million in damages.  Id. ¶¶ 207-212.

Defendants move to dismiss each cause of action under preclusion doctrines or for failure to state a claim upon which relief can be granted or, in the alternative, they seek to compel arbitration and stay further proceedings.

## A.     Preclusion Doctrines

DCC argues that Plaintiffs' claims must be dismissed because they are barred by the res judicata and collateral estoppel effects of the Year One arbitration conducted by the Independent Accountants.  A preclusion doctrine may be asserted in a Rule 12 (b)(6) motion if its availability appears from the plaintiff's pleading and the relevant facts are shown by the court's records or documents from a prior action, of which it can take judicial notice.  See AmBase Corp. v. City Investing Co. Liquidating Tr., 326 F.3d 63, 72 (2d Cir. 2003) (upholding res judicata dismissal on Rule 12 (b)(6) motion based on final state court judgment); Senatore v. Ocwen Loan Servicing, LLC, 16 CV 8125 (VB), 2017 WL 3836056, at *1 n. 1 (S.D.N.Y. Aug. 31, 2017) ("When a court considers a motion to dismiss under Rule 12 (b)(6) based on res judicata, as the Court does here, it may also consider materials subject to judicial notice, including documents from a prior action."); see also

Southard v. Southard, 305 F.3d 730, 732 n.1 (2d Cir. 1962).  Application of the preclusion

doctrines—res judicata and collateral estoppel—serves to "relieve parties of the cost and

vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent

decisions, encourage reliance on adjudication."  Allen v. McCurry, 449 U.S. 90, 94, 101

S. Ct. 411, 415, 66 L. Ed. 2d 308 (1980); Montana v. United States, 440 U.S. 147, 153-

54, 99 S. Ct. 970, 59 L. Ed. 2d. 210 (1979).

### 1.    Res Judicata

Res judicata, or claim preclusion, holds that "a final judgment on the merits of an

action precludes the parties or their privies from relitigating issues that were or could have

been raised in that action."  Allen, 449 U.S. at 94; Taylor v. Sturgell, 553 U.S. 880, 892,

128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008); Marcel Fashions Grp., Inc. v. Lucky Brand

Dungarees, Inc., 779 F.3d 102, 108-09 (2d Cir. 2015) ("The doctrine precludes not only

litigation between the parties (and their privies), but also of claims that might have been

raised in the prior litigation but were not.").  The doctrine "is based on the requirement

that the plaintiff must bring all claims at once against the same defendant relating to the

same transaction or event."  N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 88 (2d

Cir. 2000) (citation omitted).

Under Delaware law,[8] "[t]he procedural bar of res judicata extends to all [claims]

which might have been raised and decided in the first suit as well as to [those] that actually

were decided."  LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191-92 (Del. 2009)

(internal quotation marks and citation omitted).  A five-part test must be satisfied:

---

[8] SPA § 9.9 requires the application of Delaware law, and the parties agree that Delaware law applies to
Defendants' motion to dismiss.

> (1) the original court had jurisdiction over the subject matter
> and the parties; (2) the parties to the original action were the
> same as those parties, or in privity, in the case at bar; (3) the
> original cause of action or the issues decided [were] the same
> as the case at bar; (4) the issues in the prior action must have
> been decided adversely to the [plaintiffs] in the case at bar;
> and (5) the decree in the prior action was a final decree.

Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n, 902 A.2d 1084, 1092 (Del. 2006).

In determining the third factor, Delaware applies a "transactional approach."  See

LaPoint, 970 A.2d at 193.  That is, "if the pleadings framing the issues in the first action

would have permitted the raising of the issue sought to be raised in the second action,

and if the facts were known, or could have been known to the plaintiff in the second action

at the time of the first action," then the claims in the second action are precluded.  Ezzes

v. Ackerman, 234 A.2d 444, 445-46 (Del. 1967).

To determine whether claims were or could have been asserted in the first action,

courts consider (1) whether the underlying facts are related in time, space, origin, or

motivation; (2) whether the underlying facts form a convenient trial unit; and (3) whether

their treatment as a unit conforms to the parties' expectations.  See LaPoint, 970 A.2d at

193 (citation omitted).  When "a plaintiff has had a full, free and untrammeled opportunity

to present his facts, but has neglected to present some of them or has failed to assert

claims [that] should in fairness have been asserted, he will ordinarily be precluded by the

doctrine of res judicata from subsequently pressing his omitted claim in a subsequent

action."  Maldonado v. Flynn, 417 A.2d 378, 382 (Del. Ch. 1980).

DCC argues that the Arbitrator's Decision bars those of Plaintiffs' claims that

involve calculation of the Year One earn-out payments that were or could have been

brought in the arbitration proceedings.  They maintain that SPA § 1.4 (d) requires the

arbitration of *all* disputes, including the breach-of-contract and breach-of-covenant claims contained in Plaintiffs' complaint.  As such, Defendants seek dismissal of Plaintiffs' first, second, and eighth causes of action as to Year One (July 1, 2018–June 30, 2019).

Plaintiffs, on the other hand, maintain that no preclusive effect is warranted because none of their claims pertain to disputes resolved in the Arbitrator's Decision or to the Year One payments.  They further argue that they were not required to raise their present claims in the arbitration proceeding because SPA § 1.4 (d) pertains only to accounting-based disputes.

The Year One Arbitrator's Decision resolved 12 specific issues raised in the Year One Earn-out Notice.[9]  Those issues related to how certain funds, fees, charges, reserves, rebates, and the like should be accounted for under the terms of the SPA in calculating the Year One payments.  The Year One Arbitrator's Decision addresses and resolves these discrete issues, which center around specific accounting practices.  None of Plaintiffs' present claims duplicate the specific arbitration issues.  See, e.g., Complaint, ¶ 66 ("The claims advanced in this Complaint are not based on disputed accounting items covered by SPA § 1.4 (d).").

Nonetheless, DCC argues that "[t]he SPA is unequivocally clear that the exclusive mechanism to resolve any dispute over the Earn-out" is through arbitration with the Independent Accountants.  See Memorandum of Law, Docket No. 9, p. 1.  DCC seizes on the language in SPA § 1.4 (d) that requires "all unresolved disputed items" to be referred to the Independent Accountants for resolution.  They contend that this is broad,

---

[9] The Year One Arbitrator's Decision is contained in the record at Docket No. 10-4.  Although not attached to the complaint, the decision is properly considered in assessing Defendants' preclusion arguments because it is a document from a prior action, of which this Court may take judicial notice.  See Senatore v. Ocwen Loan Servicing, LLC, 16 CV 8125 (VB), 2017 WL 3836056, at *1 n. 1 (S.D.N.Y. Aug. 31, 2017).

unambiguous language encompassing any dispute that could affect an earn-out payment. Plaintiffs maintain that the arbitration provision applies only to accounting-based disputes.

At this stage, any contractual ambiguities must be resolved in Plaintiffs' favor.  See Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005); Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).  In this Court's view, Plaintiffs have adequately demonstrated that the arbitration provision in SPA § 1.4 (d) may reasonably be interpreted as pertaining only to disputed accounting techniques or methods concerning earn-out payment calculations, and not to any and all disputes concerning the SPA and the operation of the Earn-out Group that could conceivably affect earn-out payments.  As more fully explained *infra*, the objection and arbitration procedures themselves reflect a narrow nature: the scope of objections is confined to the content of the DCC's Earn-out Statement; dollar amounts for each dispute are contemplated; the right to inspection is limited to "books and records and work papers . . . relating to *the calculation* of the Earn-Out Payments;" and the Independent Accountants are authorized to resolve "only those disputed items set forth in the Earn-out Notice that remain unresolved."  SPA § 1.4 (d) (emphasis added).  Nothing in this provision, which is not an independent arbitration provision or subsection, but rather, is embedded in the "Earn-out Payments" subsection, supports DCC's contention that it is all-encompassing.  It therefore cannot be concluded at this stage as a matter of law that SPA § 1.4 (d) requires that all claims of any nature that may possibly affect earn-out payments, such as those alleged herein, must be submitted to the Independent Accountants.

DCC's reliance on <u>USG Cos. v. Advantage Sales & Mktg. LLC</u> does not compel a different conclusion.  No. 1:17-CV-861, 2018 WL 3117545 (D. Del. June 25, 2018).  <u>USG</u> concerned an Asset Purchase Agreement that contained a revenue-dependent earn-out component.  The arbitration provision there provided that "[i]f Buyer and Sellers are unable to resolve *any disagreement* with respect to the calculation of the Revenue for the Measurement Period," the disputed amounts "will be referred to the Accounting Firm . . . for final determination[.]"  <u>USG</u>, 2018 WL 3117545, at *5, 8 (emphasis added).   In construing this provision, the court found that "any disagreement" was broad and inclusive language that could be read to encompass not only accounting-practice based disagreements affecting earn-out revenue calculations, but also related matters, such as operational misconduct and unreasonable business practices engaged in to alter the revenue calculations and defeat a higher earn-out payment.  <u>See</u> <u>id.</u> at *8.  It therefore dismissed USG's breach of implied covenant of good faith and fair dealing claims, finding that "despite the legal theories employed, [USG was] fundamentally challenging the calculation of revenue during the earn-out measurement period."  <u>See</u> <u>id.</u> at *9.

USG is distinguishable.   The arbitration provision in <u>USG</u> covered *all disagreements* concerning the calculation of revenue, without limitation. The provision here, however, covers "*any objections* to the Earn-out Statement *as prepared by Buyer*." SPA 1.4 (d).  It is not as broad and open-ended; it is cabined by the content of DCC's Earn-out Statement.  The provision does not cover "all disagreements."  It covers only objections to DCC's *calculations* set forth in the Earn-out Statement that remain unresolved.  Moreover, the surrounding procedures support an interpretation that the parties intended the provision to pertain only to objections concerning accounting

methods, for example, by limiting the right of inspection to only those documents concerning the calculation of earn-out payments, to the exclusion of discovery relating to operational deficiencies or unreasonable business practices.  Consequently, this Court does not find <u>USG</u> controlling.

Returning to res judicata, Defendants have failed to demonstrate that Plaintiffs' claims are precluded, especially at this stage, where all inferences are drawn in Plaintiffs' favor.  The Arbitrator's Decision resolves Year One accounting-method disputes, none of which are challenged in Plaintiffs' complaint.  Moreover, Plaintiffs persuasively establish that arbitration of their claims is not necessarily required under SPA § 1.4 (d).  Further, the Arbitrator's Decision pertains to the period from July 1, 2018, to June 30, 2019, while Plaintiffs' claims generally post-date that timeframe.  <u>See</u> Arbitrator's Decision, Docket No. 10-4, p. 1.  Consequently, Defendants have failed to establish that Plaintiffs' present claims, or any one of them, were decided or should have been raised in the arbitration proceeding.  <u>See</u> <u>Dover Hist. Soc'y</u>, 902 A.2d at 1092.  Defendants' motion to dismiss on res judicata grounds will therefore be denied.

### 2.    Collateral Estoppel

Collateral estoppel, or issue preclusion, bars the re-litigation of issues clearly raised in a previous action or proceeding and decided against a party or those in privity, whether or not the tribunals or causes of action are the same.  <u>See</u> <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 288 (2d Cir. 2002) (noting that collateral estoppel "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding"); <u>United States v. Alcan Aluminum Corp.</u>, 990 F.2d 711, 718-19 (2d Cir. 1993) (the "fundamental notion [of collateral

estoppel] is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies").   That is, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."   Montana, 440 U.S. at 153.

To determine whether collateral estoppel applies under Delaware law, a court must consider whether

> (1) [t]he issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Betts v. Townsends, Inc., 765 A.2d 531, 535 (Del. 2000).

DCC maintains that the core issue decided in the Arbitrator's Decision was that under the SPA, compliance with GAAP takes precedence over consistency with Stampede's prior accounting practices.   This finding, according to DCC, should be given preclusive effect to bar Plaintiffs' first claim, which reportedly relies on non-GAAP principles.   Plaintiffs maintain that the Arbitrator's Decision has no preclusive effect because it resolved a limited universe of Year One accounting disputes, none of which are at issue in the complaint.

Having closely reviewed the Arbitrator's Decision, and drawing all inferences in Plaintiffs' favor, this Court finds that the Arbitrator's holdings are not as broad as DCC suggests.   Again, the Arbitrator's Decision resolved 12 discrete accounting disputes

between the parties.  These are the only disputes the arbitrator was authorized to resolve.  See SPA § 1.4 (d) (providing that the Independent Accountants "shall . . . resolve only those disputed items set forth in the Earn-out Notice that remain unresolved on the date of submission to the Independent Accountants").  In line with that limited authority, the Arbitrator's Decision reflects that her interpretations and findings concerning compliance with GAAP were for purposes of "making my determinations on the Disputed Items."[10]  See Arbitrator's Decision, p. 3.  There is no support in the Arbitrator's Decision for the overarching findings DCC suggests—that GAAP necessarily governs all present and future disputes.  In fact, the Independent Accountants are specifically prohibited from ruling prospectively.

Nonetheless, to the extent Plaintiffs' first claim could be interpreted as raising issues resolved in the Arbitrator's decision, see, e.g., Complaint, ¶¶ 63-67, such claims would be precluded.  Otherwise, Defendants have failed to demonstrate at this stage that the issues resolved in the Arbitrator's Decision are identical to any issues raised in the complaint.  See Betts, 765 A.2d at 535.  Defendants' motion to dismiss on collateral estoppel grounds must therefore be denied.

**B.    Failure to State a Claim**

**1.    Rule 12 (b)(6) Standard**

---

[10] The Arbitrator wrote as follows: "Based on my analysis of the Agreement, including the definition of Adjusted EBITA, I have interpreted the above described disputed language in the Agreement as follows *for making my determinations on the Disputed Items*: except as otherwise provided for in the Agreement, (a) if GAAP and consistency requirements conflict, GAAP should be the higher and controlling standard, and (b) the consistent use of a historical accounting method or practice that is acceptable under GAAP should prevail over a claim to change to a preferable accounting method or practice."  Arbitrator's Decision, pp. 3-4 (emphasis added).

Defendants move to dismiss the complaint under Rule 12 (b)(6) of the Federal Rules of Civil Procedure.  Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12 (b)(6).  The rule is "designed to test the legal sufficiency of the complaint, and thus does not require the Court to examine the evidence at issue."  DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).  The question, rather, is whether the complaint meets the applicable pleading standards.  See Berry v. Tremblay, 9:20-CV-177 (DNH/TWD), 2021 WL 1575951, at *2 (N.D.N.Y. Apr. 22, 2021) ("The [Rule 12 (b)(6)] motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8 (a)(2) of the Federal Rules of Civil Procedure.").

Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim.  Fed. R. Civ. P. 8 (a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S.

at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555.  Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  <u>Iqbal</u>, 556 U.S. at 678.  The plausibility standard is not, however, a probability requirement: the well-pleaded allegations in the complaint need only nudge the claim "across the line from conceivable to plausible."  <u>Twombly</u>, 550 U.S. at 570.

A two-pronged approach is thus used to examine the sufficiency of a complaint.  This examination is context specific and requires the court to draw on its judicial experience and common sense.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 679.  First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions, are identified and stripped away.  <u>See</u> <u>id.</u>  Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief."  <u>Id.</u>  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim.  <u>Id.</u>

In considering a motion to dismiss under Rule 12 (b)(6), "a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  <u>Leonard F. v. Isr. Disc. Bank of N.Y.</u>, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); <u>see also</u> <u>Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 369 F.3d 212, 217 (2d Cir. 2004).  "[W]here a document is not incorporated by reference, the court may nevertheless consider it

where the complaint relies heavily upon its terms and effect," thereby rendering the document "integral to the complaint."  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002)). But even where a document is "integral" to the complaint, it cannot serve as the basis for dismissal unless there is no dispute as to its authenticity, accuracy, and relevance.  See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) (internal citations omitted).

### 2.  First Cause of Action

Plaintiffs' first cause of action is for breach of contract.  A plaintiff asserting a breach-of-contract claim under Delaware law must allege the existence of a contract (express or implied), a breach of one or more of the contract's obligations, and damages resulting from the breach.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).

Here, Plaintiffs allege that the parties entered a valid and enforceable contract (the SPA), that DCC breached its obligations under the contract, and that Plaintiffs suffered damages as a result.  See Complaint, ¶¶ 162-168.  For example, Plaintiffs allege that DCC breached the SPA by diverting revenue and failing to refer Restricted Business to the Earn-out Group (id. ¶¶ 74-93), by reducing earn-out payments based on the unenforceable MOU concerning Furrion (id. ¶¶ 94-123), and by failing to accept COVID-19 relief funds and failing to properly address the unexpected impact of COVID-19 (id. ¶¶ 124-141).[11]  Each of these breaches is supported by factual allegations contained in the complaint, as discussed above.

---

[11] Plaintiffs do not allege an actionable breach based on accounting methodology or in the calculation of earn-out payments.  See Memorandum of Law, Docket No. 16, p. 25 n.7.

DCC argues that Plaintiffs fail to state a claim based on DCC's alleged diversion of revenue and failure to refer business because DCC's conduct was governed by and permissible under SPA § 1.4 (g) (Acquisitions).  But acceptance of this argument would require construing the alleged facts and the provisions of the SPA in DCC's favor, not Plaintiffs'.  It would also require fact-finding, which is not permitted at this stage, where only the legal sufficiency of the complaint is at issue.  Accepting as true the factual allegations concerning the alleged diversion of revenue and failure to refer business, this Court finds that Plaintiffs sufficiently state a plausible claim.

DCC next argues that Plaintiffs fail to state a breach-of-contract claim based on refusal of COVID-19 relief funds because their allegations are conclusory.  Specifically, DCC maintains that Plaintiffs provide no facts to support their claim that DCC's reasons for refusing the funds were pretextual.  See Complaint, ¶ 132.  But Plaintiffs are not required to detail the alleged pretext at this stage.

Plaintiffs allege that DCC violated several SPA provisions by requiring Stampede to return $2.4 million in COVID relief funds and to forego receipt of an additional $2.4 million.  Id. ¶¶ 124-131.  Plaintiffs further allege that Denis Tobin, who served as a Finance Director in DCC Plc's Technology Group, was the individual who required return of the funds.  Id. ¶¶ 49, 72, 130.  Further still, Plaintiffs allege upon information and belief that DCC's true reason for refusing the funds was to negatively impact Plaintiffs' Earn-out Payments, rather than the "pretextual and legally incorrect reason" provided.  Id. ¶ 132.

Reading the complaint liberally and drawing all inferences in Plaintiffs' favor, this is sufficient to state a plausible claim that DCC breached the SPA, especially when considered with other allegations that Tobin acted to negatively impact earn-out

payments.  See e.g., Complaint, ¶¶ 53, 62, 69, 70.  DCC provides no authority requiring that Plaintiffs' fully detail the referenced pretextual reasons at this stage.

Accordingly, DCC's motion to dismiss Plaintiffs' first cause of action is denied.

### 3.      Second Cause of Action

Plaintiffs' second cause of action is for breach of the implied covenant of good faith and fair dealing.  "Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract."  Chamison v. HealthTrust, Inc.—Hosp. Co., 735 A.2d 912, 920 (Del. Ch. 1999).  The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005) (internal quotation and citation omitted).  "Parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."  Id. (quotation and citation omitted).

The Supreme Court of Delaware explains the covenant as follows:

> The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions. Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document.  Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.

Id. at 441 (quotations and citations omitted).

DCC argues that Plaintiffs' claim is foreclosed by the exclusivity of remedies provision in SPA § 8.12.  With exceptions not at issue here, that provision provides that

the indemnification provisions in Article VIII of the SPA "will be the sole and exclusive remedy of the parties with respect to the subject matter of this Agreement and the transactions contemplated hereby . . . and the parties will have no other remedy or recourse with respect to any of the foregoing other than pursuant to, and subject to the terms and conditions of this Article VIII."  See SPA § 8.12.  The provision further provides that "[t]he parties acknowledge and agree that they may not avoid such limitation on liability by (x) seeking damages for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby waived . . . ."  Id.

Relying on JCM Innovation Corp. v. FL Acquisition Holdings, Inc., DCC argues that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing seeks damages "pursuant to any other theory of liability" and is therefore waived and precluded by SPA § 8.12.  C.A. No. N15C-10-255 EMD CCLD, 2016 WL 5793192, at *6-7 (Del. Super. Sept. 30, 2016) (dismissing implied covenant of good faith and fair dealing claim as barred by exclusive remedy provision).

In response, Plaintiffs maintain that their claim fits within the indemnity provision in SPA § 8.4 (b), which provides that DCC shall pay Plaintiffs for all losses "based upon, arising out of, with respect to or by reason of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by [DCC] pursuant to this Agreement."  See SPA §  8.4 (b).  Citing Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC, Plaintiffs argue that their implied covenant claim is contractual in nature, and therefore falls under SPA § 8.4 (b) as a claim seeking recovery for losses from the breach of a covenant, agreement, or obligation to be performed by DCC.  832 A.2d 116, 129 (Del. Ch. 2003) (finding that claim for breach of the implied covenant of good faith and fair

dealing fell within clause requiring indemnity for "any damage, loss, cost, or expense . . . resulting from . . . any failure by [GHC] to perform, abide by or fulfill any of the material agreements . . . in connection with this Agreement . . .").

Given the authority that the obligation of good faith and fair dealing is contractual in nature, see Gloucester Holding, 832 A.2d at 128, and construing both the SPA and the facts in Plaintiffs' favor, this Court finds that it cannot conclude at this stage that the exclusive remedy provision in SPA § 8.12 forecloses Plaintiffs' implied covenant claim. Plaintiffs sufficiently establish that recovery on the claim may fit under the indemnity provision of SPA § 8.4 (b).  Dismissal on this basis is therefore unwarranted.

DCC next maintains that dismissal is required because SPA § 1.4 (f)(i) contains specific language governing the exercise of good faith.  As noted above, the implied covenant of good faith and fair dealing cannot be used to circumvent specific contractual language or create a "free-floating duty . . . unattached to the underlying legal document." Dunlap, 878 A.2d at 441.

SPA § 1.4 (f)(i) provides as follows:

> [DCC] shall act in good faith in continuing to operate the Earn-out Group in the ordinary course consistent with past practice (but subject to the DCC Conduct of Business guidelines) with the goal of maximizing profits consistent with the medium-term development of the Company Group and shall not, directly or indirectly, take any actions that have the sole purpose of avoiding or minimizing the Earn-out Payments hereunder (in each case subject always to [DCC], acting in the best interests of the Earn-out Group and its Affiliates, not being prevented from taking or omitting to take any action for bona fide commercial or internal compliance reasons or as may be required by applicable Law)[.]

DCC argues that this provision gives rise to a cause of action only if DCC acts with "the sole purpose" of injuring Plaintiffs, and that Plaintiffs' pursuit of a claim for breach of

the implied warranty of good faith and fair dealing would impermissibly impose a "free-floating duty" requiring DCC to dispose of its own GAAP-compliant accounting processes.

Here again, however, DCC interprets the SPA in its own favor.  It maintains that Plaintiffs can only demonstrate a breach of SPA § 1.4 (f)(i) if they demonstrate that DCC acted with the "sole purpose" of avoiding or minimizing Earn-out payments.   But SPA § 1.4 (f)(i) could reasonably be read more broadly—for example, requiring DCC to act in good faith in operating the Earn-out Group to maximize profits, *and in addition*, to not act for the sole purpose of avoiding or minimizing Earn-out payments.  Moreover, Plaintiffs' claim is not factually limited to accounting processes.  As set forth above, Plaintiffs allege a much wider range of operational decisions that prevented maximum profits and resulted in reduced earn-out payments.  Dismissal on this basis is therefore denied.

Finally, DCC argues that dismissal is required because Plaintiffs fail to specifically allege that DCC acted with bad faith.  But a plaintiff asserting a breach of the implied warranty of good faith and fair dealing under Delaware law must only allege "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."  See Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc., C.A. No. 9250-VCG, 2023 WL 9053173 (Del. Ch. Dec. 29, 2023) (quotation and citation omitted).  There is no clear authority that Delaware law requires a demonstration of bad faith, fraud, deceit, or misrepresentation to prove breach of an implied covenant in a commercial-contract dispute.  See Life Plans, Inc. v. Sec. Life of Denver Ins. Co., 800 F.3d 343, 356-57 (7th Cir. 2015) (noting that Delaware courts addressing implied covenant claims outside the employment context have not required fraud as an element of the claim) (citing Gerber v. Enter. Prods. Holdings, LLC, 67 A.3d 400, 418-19 (Del.

2013), <u>overruled on other grounds by</u>, <u>Winshall v. Viacom Int'l Inc.</u>, 76 A.3d 808 (Del. 2013) and <u>Allen v. El Paso Pipeline GP Co.</u>, 113 A.3d 167, 183 (Del. Ch. 2014)); <u>O'Tool v. Genmar Holdings, Inc.</u>, 387 F.3d 1188, 1198-1203 (10th Cir. 2004) (finding that the Supreme Court of Delaware would not require such a showing).  Consequently, DCC's motion to dismiss on this basis must be denied.

### 4.    Third Cause of Action

Plaintiffs' third cause of action is for breach of contract.  A plaintiff asserting a breach-of-contract claim under Delaware law must allege the existence of a contract (express or implied), a breach of one or more of the contract's obligations, and damages resulting from the breach.  <u>VLIW Tech.</u>, 840 A.2d at 612.

Here, Plaintiffs allege that the parties entered a valid and enforceable oral agreement under which Kelly agreed to reduce aged inventory in exchange for DCC's promise to waive any right to reserve 3% of inventory value.  <u>See</u> Complaint, ¶¶ 142-45, 177.  They further allege that they suffered damages when DCC breached its obligations by reserving 3% of inventory value in Year Three despite Kelly meeting his obligations under the agreement.  <u>Id.</u> ¶¶ 146-50, 179-80.

DCC does not challenge the sufficiency of the pleading, but argues that Plaintiffs fail to state a breach-of-contract claim because the alleged oral promise to waive the right to reserve 3% of inventory value is unenforceable, since it was not contained in a signed writing, as required to amend or modify the SPA.

In response, Plaintiffs argue alternatively that the inventory-reserve promise was a separate agreement apart from the SPA or that DCC waived the writing requirement in SPA § 9.8, if considered a modification or amendment, presumably by repeatedly

promising to waive the inventory reserve and by waiving it in the Year One and Year Two Earn-out Periods.  See Complaint, ¶¶ 142-45, 149.

SPA § 1.4 (a) and Schedule A-2 contain the parties' negotiated terms concerning the 3% inventory reserve.  SPA § 9.8 provides that the SPA "may only be amended, modified or supplemented by an agreement in writing signed by each party hereto."  It further provides that "[n]o waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving."  SPA § 9.8.

In Delaware, "it is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision."  Cont'l Ins. Co. v. Rutledge & Co., Inc., 750 A.2d 1219, 1229 (Del. Ch. 2000) (citing Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972) ("The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by the course of conduct of the parties."); see also XRI Inv. Holdings LLC v. Holifield, 283 A.3d 581, 559 (Del. Ch. 2022) ("Thus, notwithstanding a contractual provision stating that a contract cannot be modified except in writing, a court may find that the parties modified their obligations orally, by conduct, or through waiver.").  Whether there has been waiver "is a fact-intensive inquiry[,] and Delaware courts have been reluctant to decide waiver on the pleadings."  CPC Mikawaya Holdings, LLC v. MyMo Intermediate, Inc., C.A. No. 2021-0707-MTZ, 2022 WL 2348080, at *13 (Del. Ch. June 29, 2022).

Here, Plaintiffs plead sufficient facts that plausibly support either an independent agreement or waiver to defeat DCC's bid for dismissal.  Plaintiffs allege that DCC induced Kelly to reduce aged inventory by consistently promising to waive any right to reserve 3% of the value of inventory (Complaint, ¶¶ 142, 143, 145), that DCC did not impose the 3% reserve for Year One and Year Two because Kelly reduced the inventory (id. ¶ 144), and that Fitzharris and Trusdale, on behalf of DCC, twice specifically promised they would not impose the 3% reserve for Year Three, if the aged inventory were reduced in a manner similar to the prior years, which it was (id. ¶¶ 145, 149).

Drawing all inferences in Plaintiffs' favor and accepting these facts as true, Plaintiffs plausibly plead that the inventory-reserve promise is an enforceable agreement or amendment and not necessarily barred by SPA § 9.8, as that provision may be subject to waiver.[12]   Because Plaintiffs state a plausible claim that is not foreclosed as a matter of law, dismissal is denied.  See Good v. Moyer, C.A. No. N12C-03-033 RRC,  2012 WL 4857367, at *6 (Del. Super. Oct. 10, 2012) (finding that where oral modification is alleged, it is reasonably conceivable that the parties also waived the no-oral-modification provision); Simon Prop. Grp., L.P. v. Brighton Collectibles, LLC, C.A. No. N21C-01-258 MMJ CCLD, 2021 WL 6058522, at *4-5 (Del. Super. Dec. 21, 2021) (similar).

**5.    Fourth Cause of Action**

Plaintiffs' fourth cause of action, pleaded in the alternative to their third cause of action, is for promissory estoppel.  "The doctrine of promissory estoppel is an equitable

---

[12] This conclusion is reached despite DCC's argument that courts will not find waiver based on a course of conduct where the parties have previously executed written amendments, such as the MOU in this case. See, e.g., AgroFresh Inc. v. MirTech, Inc., 257 F. Supp. 3d 643, 660 (D. Del. 2017).  Given Plaintiffs' assertions that the MOU was never finalized and did not serve as a variation of the SPA, a factual dispute exists that bars dismissal on this ground at the motion-to-dismiss stage.

remedy 'designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement.'" Weiss v. Nw. Broad. Inc., 140 F. Supp. 2d 336, 344-45 (D. Del. 2001) (quoting Feinberg v. Saunders, Karp & Megrue, L.P., No. 97-207-SLR, 1998 WL 863284, at *17 (D. Del. Nov. 13, 1998)).  It is applicable only in the absence of an enforceable contract; "hence, a party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract."  Id. at 345.

To state a promissory estoppel claim, a plaintiff must allege (1) that a promise was made, (2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise, (3) that the promisee reasonably relied on the promise and acted to his detriment; and (4) that the promise is binding because injustice can be avoided only by enforcement of the promise.  See Windsor I, LLC v. CWCapital Asset Mgmt. LLC, 238 A.3d 863, 876 (Del. 2020).

DCC does not challenge the sufficiency of the pleadings, but argues that Plaintiffs fail to state a claim because Delaware law does not permit a party to assert promissory estoppel based on promises that contradict the terms of a valid, enforceable contract. See Weiss, 140 F. Supp. 2d at 345.  According to DCC, the SPA expressly covers the inventory reserve issue in SPA § 1.4 (a) and Schedule A-2.  As such, any alleged promise contradicting those terms cannot form the basis for a promissory estoppel claim.  See J.C Trading Ltd. v. Wal-Mart Stores, Inc., 947 F. Supp. 2d 449, 457-58 (D. Del. 2013) (finding on summary judgment that the alleged oral promises were covered by existing Supplier Agreements, not independent of or in addition to them, and therefore promissory estoppel could not be asserted).

As just discussed, however, DCC's promise concerning the inventory reserve may plausibly be enforceable as either an independent agreement or an amendment or modification to the SPA through waiver of the SPA § 9.8 no-oral-modification provision. Because a contract-formation problem related to the inventory-reserve promise could possibly exist when the facts are developed, Plaintiffs are entitled to plead promissory estoppel in the alternative.  See Weiss, 140 F. Supp. 2d at 344-45;  (D. Del. 2001); Chrysler Corp. (Del.) v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1031 (Del. 2003) ("[T]he doctrine of promissory estoppel is properly understood as a consideration substitute in cases where a contract has not been formed.") (citing Lord v. Souder, 748 A.2d 393, 400 (Del. 1999)).  Dismissal is therefore denied.

### 6.    Fifth Cause of Action

Plaintiffs' fifth cause of action, also pleaded in the alternative to their third cause of action, is for unjust enrichment.  "Unjust enrichment is the 'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  Stone & Paper Invs., LLC v. Blanch, C.A. No. 2018-0394-PAF, 2020 WL 3496694, at *12 (Del. Ch. June 29, 2020) (quoting Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010)).  Unjust enrichment is a theory of recovery developed to remedy the absence of a formal contract.  See Stone & Paper Invs., 2020 WL 3496694, at *12.

To state a claim for unjust enrichment, a plaintiff must allege "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  Nemec, 991 A.2d at 1130.

DCC first argues that the enrichment and impoverishment elements are insufficiently pleaded because they are illusory.  That is, Plaintiffs have not sufficiently alleged that the inventory would not have otherwise been reduced or that DCC benefited monetarily by an equal amount of the reduction.  Plaintiffs maintain that the claim is sufficiently pleaded.

Contrary to DCC's arguments, this Court finds that Plaintiffs' pleading is sufficient at this stage.  Plaintiffs allege that DCC was enriched through "double dipping" by imposing the 3% reserve in Year Three and also obtaining a dramatic reduction in aged inventory, that Plaintiffs were impoverished by that imposition in the form of reduced adjusted EBITA, and that the reduction in EBITA was directly related to the enrichment DCC received.  See Complaint, ¶¶ 142-150, 188-193.  These allegations are minimally sufficient at this stage.  Dismissal on this basis is therefore denied.

Second, as it did with Plaintiffs' promissory estoppel claim, DCC argues that Plaintiffs fail to state a claim because Delaware law does not permit a party to assert unjust enrichment when an enforceable contract governs the parties' relationship, here the SPA.  See Veloric v. J.G. Wentworth, Inc., C.A. No. 9051-CV, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) ("[T]his Court routinely dismisses unjust enrichment claims that are premised on an express, enforceable contract that controls the parties' relationship because damages is an available remedy at law for breach of contract.") (internal quotation and citation omitted)).  But as found with regard to the promissory-estoppel claim, it is yet to be settled whether DCC's promise concerning the inventory reserve is enforceable as either an independent agreement or an amendment or modification to the SPA through waiver of the SPA § 9.8 no-oral-modification provision.

Dismissal on this basis is therefore unwarranted since Plaintiffs are entitled to plead unjust enrichment in the alternative.  See, e.g., LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC, C.A. NO. 12067-VCG, 2018 WL 1559936, at *17 (Del. Ch. Mar. 28, 2018) (finding that unjust enrichment can be alternatively pleaded).

### 7.    Sixth Cause of Action

Plaintiffs' sixth cause of action seeks a declaratory judgment that the Furrion MOU is not an enforceable agreement.  The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (a).  Delaware law has a similar declaratory-judgment provision.  See 10 Del. C. §§ 6501 et seq.

"Under Delaware law, contract construction is a question of law."  Pharmathene, Inc. v. Siga Techs., Inc., Civil Action No. 2627-VCP, 2008 WL 151855, at *11 (Del. Ch. Jan. 16, 2008).  In interpreting a contract, the court's task is to divine the parties' shared intent by reading the document as a whole and affording the words used their common or ordinary meaning, unless it is clear that the parties' intent was otherwise.  See Matulich v. Aegis Comm'ns Grp., Inc., No. Civ.A 2601-CC, 2007 WL 1662667, at *4 (Del. Ch. May 31, 2007); Cove on Herring Creek Homeowners' Ass'n Inc. v. Riggs, No. Civ.A. 02024-S, 2005 WL 1252399, at *1 (Del. Ch. May 19, 2005).  "If the contractual language is clear and unambiguous, the ordinary meaning of the language will generally establish the parties' intent."  Pharmathene, 2008 WL 151855, at *11.  If the contractual language is ambiguous, meaning that it is "reasonably or fairly susceptible of different interpretations

or may have two or more different meanings," the ambiguities cannot be resolved on a motion to dismiss.  Id. at *11-12; Chrysler Corp. v. Quimby, 144 A.2d 123, 132 (Del. 1958) ("[W]hether in any particular case involving oral negotiations it is 'clearly understood' that the proposed contract is tentative only is a question of intention to be inferred from the evidence.  Where the evidence is conflicting and two inferences are possible, . . . the question is for the jury.").  In other words, to succeed on a motion to dismiss, DCC must establish that its construction of the MOU is the only reasonable interpretation.  Id. at *11.

"Under Delaware law, parties may make agreements to make a contract and such an agreement 'will be enforced if the agreement specifies all of the material and essential terms including those to be incorporated in the future contract.'"  See Pharmathene, 2008 WL 15185, at *13 (quoting Vale v. Atl. Coast & Inland Corp., 99 A.2d 396, 399 (Del. Ch. 1953)).  The Supreme Court of Delaware recognizes two types of enforceable preliminary agreements:

> Type I agreements reflect a consensus 'on all the points that require negotiation' but indicate the mutual desire to memorialize the pact in a more formal document.  In Type II agreements, the parties 'agree on certain major terms, but leave other terms open for future negotiation.'  Type I agreements are fully binding; Type II agreements 'do[ ] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith.'

Cox Commc'ns, Inc. v. T-Mobile US, Inc., 273 A.3d 752, 761 (Del. 2022) (quoting SIGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 349 (Del. 2013)).

DCC maintains that the MOU is an enforceable Type I agreement; Plaintiffs maintain that the MOU is unenforceable because it sets forth only proposed terms that were subject to further negotiation before a contract would be executed.

The short MOU reflects in its caption that it is "SUBJECT TO CONTRACT."  See Memorandum of Understanding, Docket No. 10-5.  The introduction describes the MOU as "set[ting] out the *proposed terms* of the variation to the [SPA]."  Id. (emphasis added). The document contemplates a subsequent agreement, providing that the SPA "will be varied" according to four bullet-pointed terms, and that the "variation to the SPA will [be] put into legal form and executed by the parties as soon as possible."  Id.

Turning to the allegations in the complaint, which must be accepted as true, the parties engaged in extensive post-MOU negotiations in an effort to reach mutually acceptable terms regarding an amendment to the SPA that would account for the Furrion transaction.  See Complaint, ¶¶ 103, 104.  These negotiations continued through at least June 9, 2021—nearly 19 months after execution of the MOU—when DCC provided Plaintiffs a draft of a proposed amendment to the SPA, which Plaintiffs rejected.  Id. ¶¶ 111, 112.  Points on which the parties could not agree included (1) a 3% reserve for aged inventory; (2) how to treat goods received but not invoiced in financial statements; (3) a late-payment clause; (4) specific treatment for different forms of termination of the Furrion contract; and (5) treatment of any withholding if a new Furrion contract were formed.  Id. ¶¶ 1007.  At some point, Clive Fitzharris, the Managing Director of DCC Plc's Technology Group's International Unit, "indicated that the non-binding nature of the MOU was a 'foregone conclusion.'"  Id. ¶¶ 73, 120.

Considering the terms of the MOU in conjunction with the accepted facts, this Court finds that Plaintiffs sufficiently state a plausible claim that the MOU is unenforceable. DCC's arguments to the contrary are not persuasive.[13]

---

[13] DCC's arguments are centered around the factors set forth in Winston v. Mediafare Entm't Corp.  777 F.2d 78, 80 (2d Cir. 1985).

First, DCC argues that the MOU is an enforceable Type I agreement.  But the limiting language in the MOU and the continuing nature of negotiations on multiple terms, construed in Plaintiffs' favor, reveals a lack of consensus on all terms that required negotiation.  See Cox Commc'ns, 273 A.3d at 761 (noting that Type I agreements reflect a consensus "on all the points that require negotiation").  Whether the remaining terms were essential to the agreement is a question of fact that cannot be resolved on a motion to dismiss.  See Pantzer v. Shields Dev. Co., 660 F. Supp. 56, 59-60 (D. Del. 1986) ("The question of what is an essential term is often a question of fact involving a determination of each party's intent to be bound, and thus must frequently be decided by a jury.").

Second, DCC argues that the MOU caption's "SUBJECT TO CONTRACT" language did not express a reservation of the right not to be bound absent a writing.  This argument is unpersuasive in light of the requirement that the MOU be read in Plaintiffs' favor at this stage.  As set forth above, the MOU contains multiple references supporting Plaintiffs' position that the MOU simply memorialized proposed terms for a subsequent written agreement, including language that "[t]he variation to the SPA will [be] put into legal form and executed by the parties."

Next, DCC contends that Plaintiffs concede partial performance of the MOU through their allegation that "SPP would purchase approximately $55 million in goods, hire forty additional employees, operate its own fleet of trucks, and expand its warehouse operations by adding 300,000 square feet across multiple buildings."  Complaint, ¶ 97.  This Court disagrees.  It is unclear whether this allegation reflects events that actually occurred or were expected to occur.  Cf. id. ¶ 119 (alleging that DCC ultimately invested $15 million, not $50 million).  Moreover, this allegation relates to performance of the

agreement between Stampede and Furrion, not to performance of the MOU.  This Court therefore finds no basis to deem this allegation a concession.

Third, DCC contends that all MOU terms were agreed upon.  This, of course, is flatly contradicted by the factual allegations in the complaint concerning ongoing negotiations, which must be accepted as true.  The fact that the MOU does not explicitly reference disputed issues is not dispositive.

Finally, DCC characterizes the MOU as involving only "a slight variation in the Earn-out structure" and thus not the type of transaction for which a subsequent writing would be expected.  This characterization improperly draws inferences in DCC's own favor and is counter to the allegations in the complaint, which state that the MOU concerned a deal that could generate $237 million in revenue and was the largest deal ever for DCC's Technology Group.  See Complaint, ¶¶ 97, 116.

Accordingly, this Court finds that Plaintiffs sufficiently state a claim for a declaratory judgment that the MOU is unenforceable.  Dismissal of the claim is therefore denied.

### 8.    Seventh Cause of Action

Plaintiffs' seventh cause of action seeks reformation of the SPA.  "Reformation is appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."  James River-Pennington Inc. v. CRSS Cap., Inc., Civ. A. No. 13870, 1995 WL 106554, at *7 (Del. Ch. Mar. 6, 1995).  Here, Plaintiffs allege mutual mistake.

"A party seeking reformation of a contract on the grounds of mutual mistake must allege (1) the terms of an oral agreement between the parties; (2) the execution of a

37

written agreement that was intended, but failed, to incorporate those terms; (3) the parties' mutual—but mistaken—belief that the writing reflected their true agreement; and (4) the precise mistake." Fortis Advisors LLC v. Johnson & Johnson, C.A. No. 2020-0881-LWW, 2021 WL 5893997, at *19 (Del. Ch. Dec. 13, 2021) (internal quotation and citation omitted).  A "specific meeting of the minds regarding a term that was not accurately reflected in the final, written agreement" must be shown. Glidepath Ltd. v. Beumer Corp., C.A. No. 12220-VCL, 2018 WL 2670724, at *10 (Del. Ch. June 4, 2018).

Plaintiffs allege that the parties mutually understood that earn-out payments would be based on 12 quarters of business activity at the time they entered the SPA. See Complaint, ¶¶ 138, 200, 201.  The fourth quarter of the Year Two Earn-out Period, however, was negatively impacted by the COVID-19 pandemic, resulting in a 50% drop in EBITA for that quarter. Id. ¶ 134.  This caused EBITA to grow only 2% in the Year Two Earn-out Period, which reduced the Year Two Earn-out Payment by 78% as compared to Year One. Id. ¶ 135.  Plaintiffs allege that "[t]he parties did not and could not have reasonably anticipated this impact at the time the SPA was executed." Id. ¶ 137.  Plaintiffs maintain that reformation is warranted because they were denied the benefit of their bargain and effectively received Earn-out Payments based on fewer than 12 quarters of business activity, contrary to the parties' mutual intent. Id. ¶¶ 202, 203, 206.

DCC argues that Plaintiffs' reformation claim must be dismissed because the failure to anticipate the impact of the COVID-19 pandemic fails to allege a mutual mistake. See Gap Inc. v. Ponte Gadea N.Y. LLC, 524 F. Supp. 3d 224, 240 (S.D.N.Y. 2021) ("mistaken assumptions about the future do not amount to mutual mistakes").  Plaintiffs respond that under Delaware law, reformation can be used to rewrite the SPA in

accordance with the parties' expectations at the time the contract was made.  See Catamaran Acquisition Corp. v. Spherion Corp., No. CIV.A. 00C-09-180JRS, 2001 WL 755387, at *5 (Del. Super. May 31, 2001).

Even construing the complaint liberally, this Court finds that Plaintiffs fail to state a claim for reformation.  Plaintiffs fail to allege the existence of an oral agreement between the parties that was not incorporated into the SPA.  See Fortis Advisors, 2021 WL 5893997, at *19.  Accepting the allegations as true, the parties agreed that Earn-out Payments would be based on 12 quarters of business activity, which they were.  The complaint contains no factual allegations indicating that the parties agreed to 12 quarters of *uninterrupted* or *minimally profitable* business activity, only that 12 quarters would be used.  It further contains no allegations that the parties each intended or understood that only uninterrupted or minimally profitable quarters would be used.  Since no omitted agreement is alleged, there is no basis for reformation.  See Interim Healthcare v. Sherion Corp., No. Civ.A. 18977 NC, 2003 WL 22902879, at *6 (Del. Ch. Nov. 19, 2003) ("The purpose of reformation is to correct a contract in order to express the true agreement of the parties.")  And even if it were assumed that the parties would have accounted for interrupted or less profitable quarters had they contemplated the issue, that is not enough, since "[r]eformation requires an antecedent agreement, which the written instrument attempts to express."  Fortis Advisors, 2021 WL 5893997, at *19.  Here, no antecedent agreement is alleged.

Accordingly, Plaintiffs' seventh cause of action for reformation of the SPA must be dismissed for failure to state a claim upon which relief can be granted.

9.      **Eighth Cause of Action**

Plaintiffs' eighth cause of action is for breach of contract against Exertis.  A plaintiff asserting a breach-of-contract claim under Delaware law must allege the existence of a contract (express or implied), a breach of one or more of the contract's obligations, and damages resulting from the breach.  VLIW Tech., 840 A.2d at 612.

Here, Plaintiffs allege that the parties entered a valid and enforceable contract (the SPA), that Exertis breached its obligations under the contract by failing to make full and timely payment and performance of DCC's obligations under the SPA, and that Plaintiffs suffered damages as a result.  See Complaint, ¶¶ 207-212.

Exertis does not challenge the sufficiency of the pleadings, but rather, argues that dismissal is required because (1) Plaintiffs fail to state actionable claims against DCC, and therefore no guarantee is necessary; and (2) Plaintiffs failed to comply with the notice provisions in SPA 9.13 (a).  Plaintiffs maintain that they state actionable claims against DCC, and that, even assuming lack of notice, such is not a basis for dismissal.

SPA § 9.13 contains the Parent Guarantee provision.  It states in part that "[Exertis] absolutely and unconditionally guarantees the full and timely payment and performance of the obligations of [DCC] when due and payable or required to be performed, as applicable, in accordance with this Agreement and the other Transaction Documents to which [DCC] is a party."  SPA § 9.12 (a).  This guarantee is "continuing and absolute."  Id. The notice provision provides that "[i]f [DCC] fails to discharge any of its obligations when due . . ., upon written notice from [Plaintiffs] to [Exertis] of such failure, [Exertis] will perform and discharge such obligations."  Id.  The term "written notice" is not defined in the agreement.

40

At this stage, this Court finds no basis to grant Defendants' motion to dismiss Plaintiffs' claim against Exertis.   First, Exertis's argument that Plaintiffs fail to state actionable claims against DCC is mooted by this Court's findings herein to the contrary. Second, the SPA does not define "written notice" nor mandate the form of notice.  It also does not explicitly preclude a complaint from serving as notice, as Plaintiffs allege.  <u>See</u> Complaint,  ¶  209.    Finally,  even  assuming  lack  of  written  notice,  Exertis  fails  to demonstrate that dismissal would be required.  The only case it cites—<u>Medspan Shipping Service, Ltd. v. Prudential Lines, Inc.</u>—involved a finding on stipulated facts that the filing of a complaint did not satisfy the notice provisions of a commercial lease.  541 F. Supp. 1076, 1079 (E.D. Pa. 1982).  More specifically, the court found that the complaint did not satisfy "the purpose which the parties intended written notice of default to serve."  <u>Id.</u> Thus,  the  ruling  in  <u>Medspan</u>  was  fact-specific  based  on  the  parties'  intent  and  was rendered at the fact-finding stage.  <u>Medspan</u> also did not involve notice to a guarantor, and the notice provision at issue was tied to a cure period, unlike here.  <u>See</u> <u>id.</u>  <u>Medspan</u> therefore does not support dismissal at the motion-to-dismiss stage.

Accordingly, Exertis's motion to dismiss Plaintiffs' eighth cause of action is denied.

## C.    Request to Compel Arbitration

Having  resolved  the  Rule  12  (b)(6)  motion,  this  Court  turns  to  Defendants' alternative request to compel arbitration and to stay further proceedings.  As discussed in the context of Defendants' preclusion-doctrine arguments *supra*, Defendants maintain that the SPA contains a broad arbitration agreement requiring the arbitration of each of Plaintiffs'  claims  asserted  herein.    Plaintiffs,  on  the  other  hand,  maintain  that  the

arbitration provision applies only to accounting-based disputes concerning the calculation of earn-out payments.

In resolving a motion to compel arbitration, a court applies a standard similar to that applicable to a summary judgment motion, with all reasonable inferences drawn in favor of the non-moving party.  See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016); Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).  A court thus "consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file together with . . . affidavits."  Nicosia, 834 F.3d at 229 (quoting Chambers., 282 F.3d at 155).

"If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried."  Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995).  Documents outside the pleadings may properly be considered in deciding a motion to compel arbitration.  Molina v. Coca-Cola Enters., Inc., No. 08-CV-6370, 2009 WL 1606433, *1 n. 1 (W.D.N.Y. June 8, 2009).

The Federal Arbitration Act ("FAA") "establishes 'a liberal federal policy favoring arbitration agreements.'"  Epic Sys. Corp. v. Lewis, 584 U.S. 497, 505-06, 138 S. Ct. 1612, 200 L. Ed. 2d (2018) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).  It further "reflects a legislative recognition of 'the desirability of arbitration as an alternative to the complications of litigation.'"  Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987) (quoting Wilko v. Swan, 346 U.S. 427, 431, 74 S. Ct. 182, 98 L. Ed. 168 (1953)).

To that end, a written agreement to submit a dispute to arbitration found in a commercial contract is generally "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  See 9 U.S.C. § 2; Daly v. Citigroup, Inc., 939 F.3d 415, 421 (2d Cir. 2019).  Doubts concerning the scope of arbitrable issues are resolved in favor of arbitration.  See Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.  There is, however, "no presumption in favor of arbitration where the parties dispute . . . whether an obligation to arbitrate exists."  All Premium Contractors, Inc. v. Sunlight Fin., LLC., Case No. 1:23-cv-5059 (JLR), 2023 WL 6928777, at *4 (S.D.N.Y. Oct. 19, 2023) (citing Applied Energetics, Inc. v. New Oak Cap. Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011)); see also AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) ("arbitration is a matter of contract and a party cannot be required to submit to arbitrate any dispute which he has not agreed so to submit") (citations omitted).

"In deciding a motion to compel arbitration, the question is first whether the parties agreed to arbitrate, and second, whether the dispute at issue comes within the arbitration agreement."  All Premium Contractors, 2023 WL 6928777, at *3 (citing ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002)); see also Daly, 939 F.3d at 421; Pool Deals, LLC v. United Parcel Serv., Inc., 454 F. Supp. 3d 208, 213 (W.D.N.Y. 2020).  The Second Circuit has also described the inquiry as "[1] whether a valid agreement or obligation to arbitrate exists, and [2] whether one party to the agreement has failed, neglected or refused to arbitrate."  Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia, 11 F.4th 144, 162 (2d Cir. 2021) (citing LAIF X SPRL v. Axtel, S.A. de C.V., 390 F.3d 194, 198 (2d Cir. 2004)).  And it has further described the inquiry in

four parts: "(1) whether the parties agreed to arbitrate; (2) the 'scope' of the arbitration agreement; (3) whether the plaintiff's federal statutory claims are 'nonarbitrable'; and (4) if some, but not all of the clams in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration."   Abdullayeva v. Attending Homecare Servs. LLC, 928 F.3d 218, 221-22 (2d Cir. 2019) (citing JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004)).   But under any formulation, "[t]he threshold question facing any court deciding a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate."   Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012).

The party seeking to compel arbitration—here Defendants—bears the burden of demonstrating that the parties entered a written agreement to arbitrate.   See Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101-02 (2d Cir. 2022); Barrows v. Brinker Rest. Corp., 36 F.4th 45, 50 (2d Cir. 2022).   "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed." Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (summary order) (emphasis in original).   Once an agreement is established, the burden shifts to the non-moving party to counter with evidence supporting its position that no binding agreement to arbitrate was made.   See Barrows, 36 F.4th at 50.   Here, there is no dispute that the parties agreed to a binding arbitration provision in SPA § 1.4 (d).   There is thus a valid arbitration agreement.

Once it is established that a valid arbitration agreement exists, it must then be determined whether the particular dispute falls within the scope of the agreement.   See All Premium Contractors, 2023 WL 6928777, at *3; Specht v. Netscape Commc'ns Corp.,

306 F.3d 17, 26 (2d Cir. 2002).   This is a judicial determination.[14]   See Local Union 97,

IBEW v. Niagara Mohawk Power Corp., 67 F.4th 107, 112 (2d Cir. 2023) (per curiam)

(quoting Granite Rock Co. v. Int'l Broth. of Teamsters, 561 U.S. 287, 296, 130 S. Ct. 2847,

177 L. Ed. 2d 567 (2010) ("It is well settled in both commercial and labor cases that

whether parties have agreed to submit a particular dispute to arbitration is typically an

issue for judicial determination.")).   Determining the scope of the agreement is important

because "a court may order arbitration of a particular dispute only where the court is

satisfied that the parties agreed to arbitrate *that dispute*."   Granite Rock Co., 561 U.S. at

297 (emphasis in original); Cooper v. Ruane Cunniff & Goldfarb Inc., 990 F.3d 173, 179

(2d Cir. 2021).   Courts must apply "ordinary principles of contract interpretation" to

determine whether "a particular dispute is covered by the [arbitration] language to which

the parties agreed."   Local Union 97, IBEW, 67 F.4th at 114.

Defendants argue that SPA § 1.4 (d) is a broad provision that requires the

arbitration of any claim that could possibly affect the measure of earn-out payment due,

no matter what form the claim may take.   This conclusion, they argue, is compelled by

Delaware caselaw, which construes similar arbitration provisions as encompassing

claims akin to those in Plaintiffs' complaint.   According to Plaintiffs, SPA § 1.4 (d) does

not require arbitration of their claims because the provision pertains only to accounting-

---

[14] No provision in the SPA reflects a clear agreement to have the Independent Accountants decide questions of arbitrability.   See Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. ___, 139 S. Ct. 524, 529, 202 L. Ed. 2d 480 (2019) (noting that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also questions of arbitrability).   "[I]n the absence of an arbitration agreement that clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator, the question whether the particular dispute is subject to an arbitration agreement 'is typically an issue for judicial determination.'"   Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 191 (2d Cir. 2010) (quoting Granite Rock Co. v. Int'l Broth. of Teamsters, 561 U.S. 287, 296, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)).

based disputes concerning the calculation of earn-out payments, which are not raised in its complaint.

As this Court forecasted above, it agrees with Plaintiffs' position and finds that the plain terms of the arbitration provision in SPA § 1.4 (d) require arbitration with the Independent Accountants of only accounting-based disputes concerning the calculation of earn-out payments, not all disputes of any sort that could conceivably affect those payments. The parties' intent in this regard is reflected in the structure of the arbitration provision.

The arbitration agreement in SPA § 1.4 (d) covers only the limited Earn-out Statement/Earn-out Notice process. That process starts with DCC providing Plaintiffs an Earn-out Statement, which is required to contain DCC's methodology for determining and calculating the Earn-out payments under the complex formulas set forth in the SPA. If Plaintiffs dispute DCC's calculations, they must include "any objections to the Earn-out Statement" in an Earn-out Notice, but the term "any objections" relates to "the Earn-out Statement *as prepared by [DCC]*." Id. (emphasis added). That is, the objections are limited to DCC's accounting-based calculation of the Earn-out payments. Contrary to DCC's contention, nothing in SPA § 1.4 (d) suggests that the parties intended "any objections" to include disputes of any nature that could conceivably affect earn-out payments, such as claims relating to operational misconduct or deficiencies or unreasonable business practices.

This conclusion is further supported by SPA § 1.4 (d)'s inspection provision. In the event of a dispute over the calculations in the Earn-out Statement, Plaintiffs' right of inspection is limited to the Earn-Out Group's "books and records and work papers . . .

46

relating to *the calculation* of the Earn-out Payments."  <u>See</u> SPA § 1.4 (d) (emphasis added).  There is no broad inspection or discovery procedure that one might expect if the arbitration provision was meant to cover any dispute of any kind that might affect earn-out payments.

The arbitration provision is triggered only if the parties are unable to resolve any disputed items on their own after good faith negotiations.  In such a case, "all unresolved disputed items" are referred to the Independent Accountants.[15]  <u>Id.</u>  The Independent Accountants must then "render a written report on the unresolved disputed items with respect to the Earn-out Statement and related Earn-out Payments as promptly as practicable, but in no event greater than 30 days after such submission."  <u>Id.</u>  If arbitration is triggered, the parties must furnish the Independent Accountants their "work papers, schedules and other documents and information relating to the unresolved disputed items."  <u>Id.</u>  SPA § 1.4 (d) further requires that the Independent Accountants not "employ any accounting standards or principles, except for those provided in the [SPA]."  These terms further support the conclusion that the parties agreed to only an accounting-based arbitration provision.

The cases Defendants rely on do not require a different result.  This Court has already distinguished <u>USG</u> *supra*.  <u>TMIP Participants LLC v. DSW Grp. Holdings LLC</u> involved a procedural timeliness dispute related to the parties' agreed upon earn-out objection procedures, which a special master found fell within the contractual arbitration

---

[15] In their reply brief, Defendants maintain that it is "crystal clear" that the parties intended the Independent Accountants to have authority over all disputed items, not just those relating to the calculation of the earn-out payments, because the Independent Accountants act as arbitrators of "all unresolved disputed items." <u>See</u> Reply Brief, Docket No. 20, pp. 1, 2.  This argument fails to acknowledge that "all unresolved disputed items" refers only to unresolved accounting-based disputes arising out of the Earn-out Notice.  <u>See</u> SPA § 1.4 (d).

provision.  C.A. No. 11328, 2016 WL 490257, at *11 (Del. Ch. Feb. 4, 2016) (Master's Report).    Unlike here, the dispute in <u>TMIP Participants</u> concerned "a substantive accounting issue: deciding between two alternative methods of calculating Transaction Proceeds."  <u>Id.</u>  And the other case Defendants' rely upon—<u>Sapp v. Industrial Action Services, LLC</u>—has been reversed.  Civil Action No. 19-912-RGA, 2020 WL 2813176 (D. Del. May 29, 2020), <u>reversed by</u>, 75 F. 4th 205 (3d Cir. 2023).  While Defendants correctly note that some Delaware courts have read arbitration agreements related to earn-out disputes to include conduct-related claims that impact earn-out, they have failed to provide any cases involving provisions analogous to the provision here, which governs only the limited Earn-out Statement/Earn-out Notice process set forth in SPA § 1.4 (d).

Finally, Defendants argue for the first time in reply that the presence of SPA § 1.4 (d) (Earn-out Payment Calculations) and 1.4 (f) (Conduct of Business) in the same section supports the conclusion that the parties intended the arbitration provision in SPA § 1.4 (d) to be overarching and encompass Plaintiffs' breach-of-covenant claims.  This might be persuasive if the arbitration provision were contained in its own § 1.4 subsection, but this Court views its inclusion in only the payment-calculation provision as better supporting the conclusion herein.    Defendants also suggest in reply that arbitration should be compelled even if Plaintiffs' claims fall outside of SPA § 1.4 (d) because the claims are "inextricably tied up" with properly arbitrable claims, such as those raised in the Year One arbitration.  Given the nature of the claims asserted here, this Court fails to see compelling "substantial overlap" between them and discrete, accounting-based claims.

Accordingly, this Court finds that SPA § 1.4 (d) does not require arbitration of Plaintiffs' non-accounting-based claims.  Defendants' request to compel arbitration and to stay further proceedings is therefore denied.[16]

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss Plaintiffs' claims under preclusion doctrines and for failure to state claims upon which relief can be granted is denied in part and granted in part.  Any claims or issues directly resolved in the Arbitrator's Decision are dismissed as precluded.  Plaintiffs' seventh cause of action is dismissed for failure to state a claim upon which relief can be granted.  All other claims will proceed to discovery.  Defendants' alternative request to compel arbitration and to stay these proceedings is denied.

## V.    ORDERS

IT HEREBY IS ORDERED, that Defendants' motion to dismiss (Docket No. 8) is granted in part, and denied in part.  Any claims or issues directly resolved in the Arbitrator's Decision are dismissed as precluded.  Plaintiffs' seventh cause of action is dismissed for failure to state a claim upon which relief can be granted.  Defendants' alternative request to compel arbitration and to stay these proceedings is denied.

---

[16] Plaintiffs request an order staying any proceedings before the Independent Accountants that DCC may initiate.  See Memorandum of Law, Docket No. 16, pp. 15-16.  This request appears to be in response to Defendants' representation that they contacted the Independent Accountants on September 7, 2022, to commence an arbitration of the Year Three Earn-out.  See Memorandum of Law, Docket No. 9, p. 2.  It is unclear, however, whether such arbitration ever came to fruition.  Because Plaintiffs concede that some proceedings before the Independent Accountants may be appropriate, see Complaint, ¶ 64, and because there is nothing before this Court suggesting that arbitration proceedings are currently ongoing, this request is denied without prejudice.

FURTHER, that Defendants must file an answer to Plaintiffs' complaint within 14 days of the entry date of this decision.

SO ORDERED.


Dated:      March 20, 2024
              Buffalo, New York


                                          <u>s/William M. Skretny</u>
                                       WILLIAM M. SKRETNY
                                United States District Judge